**Angel TORRES, Defendant Below–Appellant,**

v.

**STATE of Delaware, Plaintiff Below–Appellee.**

**No. 12,2009.**

Supreme Court of Delaware.

Submitted: July 29, 2009.

Decided: Aug. 24, 2009.

---

38. *Id.*

Michael W. Modica, Esquire, (argued) Wilmington, Delaware for appellant.

James T. Wakley, Esquire and Danielle J. Brennan, Esquire (argued), Department of Justice, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, BERGER, and RIDGELY, Justices.

RIDGELY, Justice.

Defendant–Appellant Angel Torres appeals from his Superior Court conviction for two counts of trafficking cocaine over 100 grams and two counts of delivery of cocaine. Torres makes six arguments on appeal. First, he contends that the prosecutor improperly threatened a witness who provided favorable testimony for Torres, by stating to the witness during redirect examination: "one lie gets you another ten years in prison." Second, Torres argues the prosecutor vouched for the credibility of that same witness by emphasizing the consequences of a lie under his plea agreement. Third, Torres contends the trial court erred by denying his motion for judgment of acquittal because the State failed to introduce sufficient evidence to find that the "substance" in question was cocaine and that it weighed over 100 grams. Fourth, he contends that the trial court abused its discretion under Delaware Rules of Evidence 403 and 404(b) by allowing the State to admit evidence of a separate drug transaction. Fifth, Torres contends that the trial court committed plain error by admitting his prior history of illegal cocaine transactions, because it violated the court's prior orders and directions excluding such evidence. Finally, he argues the cumulative effect of all the errors deprived him of a fair trial. We find no merit to his arguments and affirm.

## I. Facts and Procedural History

Torres was charged with multiple drug related offenses stemming from drug transactions with Raul Morales. The case against Torres centered on three transactions in which Torres allegedly supplied cocaine for Morales, a cocaine dealer who was under surveillance by the Delaware State Police (the "DSP"). In October 2006, the DSP set up a wiretap on Morales's phone and placed a Global Positioning System ("GPS") tracking device in his truck. During their surveillance of Morales, the DSP intercepted phone conversations between Morales and Torres, which led them to conduct surveillance on Torres as well. At trial, the State's primary evidence consisted of recorded conversations

between Morales, Torres, and Mark Grillo (a prospective buyer), suggesting proposed drug transactions.

On October 21, 2006 the DSP intercepted a phone call between Torres and Morales at approximately 1:00 p.m. During that call, Torres asked Morales: "Is your driveway cleaned?" Morales responded that his truck was parked in the driveway. When Torres asked for it to be moved, Morales suggested that he would come to him, because someone was working on his house. The DSP then followed Morales to Torres's home, which was now also under surveillance, and observed Morales walk into the home, stay awhile, and then leave.

Two hours later Morales called Torres and stated "I measured those things and they were all off." Torres, sounding concerned, replied "oh hell no." Morales confirmed his prior statement and said "on each thing, with the thing, it was 404." Torres, apparently growing more concerned, instructed Morales on how to weigh the substance: "Listen to me. Listen to me. Each one, they're doubled right? You gotta take them out of one and throw them—just one without plastic is 126 even...."[1] Morales then informed Torres he was playing a prank on him, and that the weight of the substance was not an issue. At trial, Morales testified that he received 500 grams of cocaine from Torres on October 21; however, police never recovered the cocaine from the delivery.

On October 25, 2006, Grillo called Morales to see if he could "set something up maybe for like tomorrow or Friday." Grillo placed an order for eighteen ounces (approximately half a kilogram) with Morales. Morales accepted the order and agreed to make the delivery two days later. Morales then called Torres to order a half-kilogram of cocaine to be ready by October 27. On October 27, Torres called Morales to inform him the cocaine would be separated in plastic bags and ready for delivery by 2:00 p.m., but at about 2:00 p.m., Torres called Morales to inform him the full order would not be delivered. Morales agreed to make up the difference from his own supply and Torres delivered the cocaine to Morales around 5:30 p.m. At trial, Morales testified that he received "a little less than 500 grams" of cocaine from Torres on October 27. On November 4, the DSP executed a search warrant at Grillo's home and seized 434.12 grams of cocaine.

On November 1, 2006, Michael Willhide called Morales requesting to purchase a kilogram of cocaine. After ending his conversation with Willhide, Morales called Torres requesting an "entierro," which Morales explained meant "a whole key" or a kilogram of cocaine. Morales then picked up the requested cocaine in Philadelphia and delivered it to Willhide in Newark. The DSP later searched Willhide's home and discovered more than a kilogram of cocaine.

Torres was arrested and indicted for two counts each of trafficking cocaine in excess of 100 grams and delivery of cocaine, stemming from the October 21 and 27 drug transactions. Torres was not charged in connection with the November 1 transaction; however, the State provided notice that it intended to present the November 1 transaction as evidence of uncharged misconduct pursuant to D.R.E. 404(b) to show a "common scheme or plan." Torres objected and the trial judge ruled that the uncharged transaction was "relevant to the motive and plan" and that it was not unfairly prejudicial.

---

1. Morales testified that "thing" referred to the bag, that "404" referred to 4½ ounces or 127.6 grams, and "126" referred to 1.26 ounces, or 35.71 grams.

The State's primary witness at trial was Morales, who had entered into a plea agreement with the State in which he would receive sentencing consideration in exchange for providing substantial assistance in identifying his co-conspirators and testifying truthfully at their trial. Morales testified that he got his cocaine supply from Torres and, after hearing several recordings of phone calls, testified that he made pickups from Torres on October 21 and October 27. However, on cross-examination, Morales testified that he did not recall any drug transactions with Torres on October 21 or on October 27, and explained that he would have to hear the phone calls from those dates. Upon inquiry by defense counsel, Morales also admitted that, under his plea agreement with the State, he faced spending the rest of his life in jail if he failed to tell the truth.

On redirect, the prosecutor embarked on the following line of questioning:

Q: Mr. Morales, let's—to borrow the parlance, let's cut through everything now. One lie gets you another decade.—

\* \* \*

Q: One lie gets you another ten years in prison, is that your understanding?
A: Yes.
Q: That's what's at risk with your testimony here today.
A: Right.
Q: You don't know if that's going to be pulled, but one lie could pull it and everything is done.
A: Right.

Immediately following this exchange, the prosecutor played a recording of two phone calls between Torres and Morales. Morales subsequently identified one recording as pertaining to the delivery of 500 grams of cocaine from Torres on October

21, and the other as pertaining to the delivery of "a little less than 500 grams" of cocaine from Torres on October 27. Then, in response to the prosecutor's question, Morales admitted that on October 21 and October 27 he received half a kilo of cocaine in Delaware.

During summation, the prosecutor again addressed the plea agreement Morales made with the State:

Raul Morales pled guilty. He came in here to testify, having pled guilty, and he agreed to testify with a larger prison sentence looming over his head if he were not truthful. [The trial judge] just told you that you are the sole judges of the credibility of the witnesses and that you can give credit to those portions of the testimony that you believe and you can disregard those portions of the testimony you find not to be credible.

The State would suggest to you that Raul Morales came in here trying to walk a tightrope, a tightrope of his own making on which his faith and that of his buddy Angel Torres rested. He had to testify truthfully, but he did not want to throw his lifelong friend off of his tightrope, so he tried not to remember. He tried to wiggle, he tried to mumble, but when he was asked by [defense counsel] "Cut to the chase, did you make drug transactions with Angel Torres on October 21st and October 27th," your recollections will be what is important, but the State would suggest Raul Morales' answer was "I'd have to listen to the phone calls." And he's right, the phone calls tell it.

In Torres's summation, defense counsel also highlighted Morales' plea agreement to show that Morales was biased:

Raul Morales, under oath, and with his, basically looking at life in prison, testifies I can't remember that that happened that day. And the phone calls

themselves show that there was so many different things going on probably in so many different places, that he's probably absolutely right.

Now, it wasn't until on cross [the prosecutor] reminded Mr. Morales that, something to the effect of, [s]o you have ten years hanging in the balance here, so did Angel Torres give you drugs on that day? And the answer, of course, was yes. But again, the State avoided asking really what this is about, when and—well, not when on that case, but where, where did it happen, because they didn't want to hear the answer.

On rebuttal, the prosecutor again addressed the plea agreement: You heard that there was a reference to ten years. He actually talked about that earlier in his testimony, that he could get ten more years in prison, with what? One lie. If he lies once, he goes to jail for ten years. And with that on him in the end, he said, yes, that was 500 grams on that date, the 21st, and then six days later on October 27th, the 439 grams. You can understand where Raul Morales is coming from. You can even sympathize with his situation.

At the close of the State's case, Torres moved for judgment of acquittal on all charges, contending in part, that there was insufficient evidence that the October 21 transaction involved cocaine.[2] The court denied the motion, explaining:

> It's far from a clear situation ... I think there's sufficient circumstantial evidence to allow the issue to be submitted to the jury.

We have the defendant in possession of the substances that have been analyzed to be cocaine on October 27, as well as November 1. We have the purchaser of the cocaine on the 27th who distributed it and had been buying from Morales for a period of time without complaint from any of his customers. We have Morales's testimony that he always obtained his cocaine from the defendant. And that is not the strongest case in the world, but it creates at least a prima facie case. It can go to the jury as to the charges on October 21.

The jury found Torres guilty of all charges. Ultimately, the trial judge sentenced Torres to a mandatory minimum sentence of sixteen years at Level V. This appeal followed.

## II. Prosecutorial Misconduct

Torres claims that he was denied a fair trial because of prosecutorial misconduct. Specifically, he argues that the prosecutor (1) intimidated Morales into changing testimony favorable to Torres by threatening Morales on redirect examination with the condition in his plea agreement that he testify truthfully; and (2) improperly vouched for Morales's credibility during summation by emphasizing the fact that, pursuant to his plea agreement, Morales would face an additional ten years in prison if he lied.

■■■ Because Torres did not object to the asserted prosecutorial misconduct at trial, and the trial judge did not intervene *sua sponte*, we review the alleged miscon-

---

2. The court commented that, "other than the statements of Mr. Morales, we don't know if it was cocaine or not." Furthermore, neither side specifically asked Morales, "How do you know it really was" cocaine? The court also stated:

> The other issue is whether that's a distinct separate quantity of cocaine apart from the

cocaine this is the basis for the October 27. Obviously, if it's the same cocaine, that can't be a different charge.

> But I don't have anything that shows a disposition of the cocaine that, according to this evidence, was in Raul's possession on the 21st. I don't have any evidence that he delivered it to anyone.

duct for plain error.[3] In a plain error review of prosecutorial misconduct, we first review the record *de novo* to determine whether misconduct occurred.[4] If we determine that no misconduct occurred, our analysis ends. If, however, the prosecutor did err, the next step of our analysis is to apply the *Wainwright* standard, which requires the error to be "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the *trial* process."[5] Further, we find plain error only for "material defects which are apparent on the face of the record, which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[6] If we determine that plain error occurred under the *Wainwright* standard, we will reverse without reaching the third step of our analysis.[7]

■ If the alleged misconduct does not satisfy *Wainwright*, we consider, as required by *Hunter v. State*,[8] whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the *judicial* process. Under the *Hunter* analysis, we *may* reverse, but need not do so, even if the prosecutorial misconduct would not warrant reversal under the *Wainwright* standard.[9] However, other options are available to remedy even egregious misconduct, such as referring the matter to the Attorney General or the Office of Disciplinary Counsel.[10]

**A.** *The prosecutor did not "threaten" Morales.*

■ Torres contends that he was denied a fair trial because the prosecutor signaled to Morales that he needed to recant his cross-examination testimony in order to avoid jeopardizing his plea agreement with the State, and threatened Morales with: "One lie gets you another decade.... One lie gets you another ten years in prison.... That's what's at risk with your testimony today."

In *Washington v. Texas*,[11] the United States Supreme Court held a defendant's right to call witnesses to establish a defense is a fundamental element of due process. In *Webb v. Texas*,[12] the United

---

3. *See Hardy v. State*, 962 A.2d 244, 247 (Del. 2008); *Baker v. State*, 906 A.2d 139, 151 (Del. 2006). *See generally Wainwright v. State*, 504 A.2d 1096 (Del.1986) (plain error standard).

4. *Baker*, 906 A.2d at 150.

5. Id. at 150 (quoting *Wainwright*, 504 A.2d at 1100) (emphasis added in *Baker*).

6. *Id.*

7. *Baker*, 906 A.2d at 150.

8. 815 A.2d 730, 732 (Del.2002); *accord Baker*, 906 A.2d at 150.

9. *Id.* at 737–38; *accord Baker*, 906 A.2d at 150.

10. *Baker*, 906 A.2d at 150.

11. 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (finding defendant denied Sixth Amendment right to have compulsory process for obtaining witnesses by statutes providing that principals, accomplices, or accessories in same crime cannot be introduced as witnesses for each other, thus denying defendant right to call witness who was physically and mentally capable of testifying to events that he had personally observed and whose testimony would have been relevant and material to defense).

12. 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (finding trial judge's threatening remarks effectively drove witness off the stand and deprived petitioner of due process when judge warned witness of his right to refuse to testify and of necessity to tell the truth, but also implied that he expected witness, who had a prior criminal record, to lie and as-

States Supreme Court found a denial of due process where the trial judge threatened the sole defense witness with perjury charges, likely conviction, a multiple-year sentence, and negative review by a potential parole board. However, the United States Supreme Court did not address whether a mere warning to a witness of the consequences of perjury would constitute reversible error.

In *United States v. Pierce*,[13] the Sixth Circuit Court of Appeal held that such a warning of the consequences of perjury does not constitute reversible error. The Sixth Circuit noted that:

> [*Webb* ] does not stand for the proposition that merely warning a witness of the consequences of perjury demands reversal. "Judges and prosecutors do not necessarily commit a Webb type violation merely by advising a witness of the possibility that he or she could face prosecution for perjury if his or her testimony differs from that he or she has given previously." In fact, the government has an obligation to warn unrepresented witnesses of the risk that the testimony they are going to give can be used against them. "Where, however, the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong."[14]

Thus, the Sixth Circuit found that governmental conduct must amount to a substantial interference with a witness's free and unhampered determination to testify before a due process violation will be found.[15]

There was no such substantial interference here. Taken in context with defense counsel's inquiry on cross-examination into Morales's plea agreement, the prosecutor's questioning was simply an attempt to clarify the terms of Morales' plea agreement. Defense counsel's questioning incorrectly suggested to the jury that Morales faced a life sentence if he testified in violation of the plea agreement. That inquiry overstated the penalty to Morales for lying. In fact, as the prosecutor clarified, Morales only faced an additional ten years in prison if he failed to testify truthfully. Moreover, Morales did not change his testimony in response to the prosecutor's clarification. Throughout his testimony, Morales was evasive, maintaining that he did not recall anything about the drug transactions with Torres until specifically confronted with the various taped phone conversations. We find no merit to Torres's claim that he was denied a fair trial by the prosecutor's redirect examination.

B. *The prosecutor did not improperly "vouch" for Morales.*

■ Torres also contends that the prosecutor engaged in misconduct by vouching for the credibility of Morales during the course of his redirect examination of Morales by emphasizing the consequences of a lie under his agreement with the State, and compounded that error during closing argument and rebuttal. Torres argues that the prosecutor's repeated reference to

---

sured him that if he lied he would be prosecuted and time would be added to his present sentence and that result would be to impair his chances of parole.).

13. 62 F.3d 818, 832 (6th Cir.1995) (rejecting claim of misconduct by prosecution for merely warning a witness of the consequences of perjury).

14. *Id.* at 832 (quoting *U.S. v. Smith*, 997 F.2d 674, 680 (10th Cir.1993); *U.S. v. Jackson*, 935 F.2d 832, 847 (7th Cir.1991)).

15. *Id.* at 833; *see also U.S. v. Heller*, 830 F.2d 150, 153–54 (11th Cir.1987) (government intimidation deprived defendant of an important defense witness and induced witness to provide false testimony against defendant).

the plea agreement and his repeated statement that "one lie gets you another 10 years in prison" was impermissible because it was an indication to the jury that Morales lied on cross-examination, and, by emphasizing the consequences of a "lie," signaled to the jury that the prosecutor was taking steps to remedy false testimony.

■■■ Prosecutors are prohibited from vouching for the credibility of a witness by stating or implying personal knowledge of the truth of the testimony, beyond that which can be logically deduced from the witness' trial testimony.[16] Improper vouching occurs when the prosecutor implies some personal knowledge that the witness has testified truthfully.[17]

As noted above, the prosecutor's reference to the plea agreement during redirect was not a threat, but an attempt to eliminate confusion about the plea agreement created during cross-examination. Therefore, there was no error to compound during summation. Nor did the summation or rebuttal contain improper vouching standing alone. During the State's opening summation, the prosecutor reminded the jury of the plea agreement between Morales and the State, Morales's testimony, and the recorded phone conversations between Morales and Torres that were entered into evidence. Each was a fact in evidence in this case. In no way did the prosecutor imply that he possessed knowledge outside the evidence presented at trial. On rebuttal, the prosecutor revisited the plea agreement in order to respond to Torres's use of the agreement during summation in an attempt to suggest he was biased, and thus, impeach Morales. In this context, the prosecutor did not suggest he held any additional personal knowledge that Morales was telling the truth, he merely argued that the existence of the plea agreement was likely to incentivize Morals not to lie, rather than merely inculpate Torres.

■■■ To the extent that Torres suggests that the prosecutor improperly used the word "lie," this argument is without merit. We have held that the use of the word "lie" should be used sparingly when describing the testimony of a witness.[18] Nevertheless, there is no blanket prohibition on the use of the word "lie." Here, the word "lie" was not used inappropriately, because the prosecutor was not suggesting Morales lied to the jury; rather the prosecutor used the word "lie" in discussing the tension Morales faced between fulfilling the plea agreement and Morales' reluctance to testify against Torres, his lifelong friend.

## III. Sufficiency of Evidence

■■■ Torres next contends that the Superior Court erred as a matter of law when it denied his motion for judgment of

16. *Caldwell v. State*, 770 A.2d 522, 530 (2001).

17. *White v. State*, 816 A.2d 776, 779 (Del. 2003); *Clayton v. State*, 765 A.2d 940, 942–43 (Del.2001) ("As a general rule, prosecutors may not express their personal opinion or beliefs about the credibility of witnesses or about the truth of testimony.").

18. *Hughes v. State*, 437 A.2d 559, 571 (Del. 1981). In *Hughes*, we explained that "a witness or a party may be mistaken, uninformed, or erroneous in his facts or conclusions in many ways, and yet not be a liar; labeling a witness as a 'liar' or to argue that he has 'lied' is to say something quite different about his testimony. The characterization of testimony as a 'lie' ... is necessarily to say that the witness made 'an untrue statement with intent to deceive.'" Thus, "unless, (a) [it] is a legitimate inference which may be drawn from the evidence, and (b) the prosecutor relates his argument to specific evidence which tends to show that the testimony or statement is a lie," it is impermissible. *Id.*

acquittal. We review the court's denial of a motion for judgment of acquittal *de novo* to determine "whether *any* trier of fact, viewing the evidence in the light most favorable to the State, could find [the defendant] guilty beyond a reasonable doubt of all the elements of the crime." [19]

■ Torres challenges the sufficiency of evidence adduced to support only the charges stemming from the October 21 transaction. In order to find Torres guilty of trafficking cocaine over 100 grams, the jury was required to find that he knowingly sold, manufactured, delivered, or brought into this State, or was knowingly in actual or constructive possession of 100 grams or more of cocaine.[20] In order to find Torres guilty of delivering cocaine, the jury was required to find that he delivered, or possessed with the intent to deliver, cocaine.[21] Torres argues that the State failed to present sufficient evidence to establish that the substance he delivered on October 21 was cocaine, and that it weighed in excess of 100 grams.

The State never recovered the substance delivered on October 21; therefore there could be no chemical testing or expert testimony establishing the identity and weight of the substance. Instead, the State offered the testimony of Morales, who testified that he was a drug dealer who dealt in large quantities of cocaine— "from a kilo to a half a kilo," that Torres was his supplier, and that when he picked up cocaine from Torres, he brought it home and weighed it on a scale. Although Morales was a reluctant and uncooperative witness who repeatedly denied remembering what he said and what he did on certain days, when confronted with the recordings from the wiretapped phone calls, he testified that he received 500 grams of cocaine from Torres on October 21 and "a little less than 500 grams" of cocaine from Torres on October 27. Taken in the light most favorable to the State, this testimony alone was sufficient to establish both that the substance was cocaine and that it weighed in excess of 100 grams.[22]

Torres argues that there was no testimony from Morales as to how he knew that the substance was cocaine. He argues that, in the past, we have required evidence establishing a lay witness' familiarity with cocaine, such as prior use or dealing, or knowledge based upon appearance, smell or other factors, before finding the witness qualified to offer his opinion that the substance was cocaine.[23] Torres

---

**19.** *Comer v. State*, 977 A.2d 334 (Del.2009); *Pennewell v. State*, 977 A.2d 800(Del.2009); *Brown v. State*, 967 A.2d 1250, 1252 (Del. 2009).

**20.** 16 *Del. C.* § 4753A(a)(2)c.

**21.** 16 *Del. C.* § 4751(a).

**22.** *Wright v. State*, 953 A.2d 188, 195 (Del. 2008). In *Wright*, we held that any "lay witness with familiarity and experience with the drug in question may testify and establish the drug's identity by factors other than the witness's personal use." *Id.* at 195. In that case, the witness, who had supplied the substance in question to the defendant, identified the substance as cocaine based on his experi-

ence as a cocaine dealer and his ability to smell the substance. *Id.* at 190–91. We found that this lay opinion testimony was sufficient evidence from which a reasonable jury could infer the substance to be cocaine. *Id.* at 195.

**23.** *Wright*, 953 A.2d at 190–91; *see also Campbell v. State*, 974 A.2d 156, 168–69 (Del.2009) (holding that a drug user may be competent to testify about the identity of a controlled substance under Delaware Rule of Evidence 701 as long as the State "lays a foundation that the witness' testimony is rationally based on his own perception of and personal experience with the substance and not on scientific, technical or specialized knowledge.").

asserts that no such evidence was offered here. We disagree.

Morales testified that he had been dealing in cocaine for approximately a year before his arrest. He explained that he would pick up the cocaine from Torres, bring it home, and weigh it on a digital scale. Additionally, Morales demonstrated familiarity with the manner in which cocaine is distributed, including testimony as to how it is packaged for delivery, and the price structure. In addition, there was evidence that Grillo had been buying cocaine from Morales for a period of time without complaint from any of his customers that the substance was counterfeit. This circumstantial evidence was sufficient to establish that Morales's opinion was based on his own perception of and personal experience with the substance. Accordingly, when viewed in the light most favorable to the State, the evidence is sufficient to support Torres's convictions for trafficking and delivery of cocaine stemming from the October 21 transaction.

## IV. Evidence of Uncharged Misconduct

Torres also contends that the Superior Court abused its discretion by allowing the State to present evidence of the November 1 drug transaction as evidence of uncharged misconduct. Torres contends the prejudicial value of this evidence outweighs its probative value under 404(b). Torres also argues that the court abused its discretion by allowing the State to elicit testimony from Morales that he was dealing cocaine for a year prior to his arrest involving amounts from a half kilogram to a kilogram, and that Torres was his supplier. Torres contends that this evidence was overly broad because it was not confined to the timeframe at issue in the

prosecution and did not directly relate to any of the approved wiretap conversations or events of October 21 or October 27.

 An abuse of discretion arises when the trial judge "has ... exceeded the bounds of reason in view of the circumstances, [or] ... so ignored recognized rules of law or practice so as to produce injustice."[24] We have outlined a two-step analysis to be applied when the "defendant's appeal is grounded on allegations that the [trial judge] erred as a matter of law or abused his discretion in submitting claims to the jury and in admitting certain evidence." "[We] will first consider whether the specific rulings at issue were correct. If [we] find error or abuse of discretion in the rulings, [we] must then determine whether the mistakes constituted significant prejudice so as to have denied the appellant a fair trial."[25]

A. *The trial court did not err in admitting evidence of the November 1 transaction.*

 The State provided notice prior to trial that it was going to present evidence of Torres's involvement in the November 1 transaction pursuant to Rule 404(b) to show a "common scheme or plan" to traffic and deliver cocaine with Morales. Following Torres's objection, the judge ruled that the evidence was admissible because it "was relevant to motive and plan" and was not unfairly prejudicial.

 Although evidence of uncharged misconduct is generally inadmissible to prove the character of a person in order to show action in conformity therewith, Delaware Rule of Evidence 404(b) provides that evidence of uncharged misconduct may be admissible for other pur-

24. *Edwards*, 925 A.2d at 1284 (quoting *Lilly v. State*, 649 A.2d 1055, 1059 (Del.1994)).

25. *Id.* at 1284–85 (citing *Charbonneau v. State*, 904 A.2d 295, 304 (Del.2006)).

poses, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.'"[26] We adopted an inclusive approach to this rule in *Getz v. State*,[27] explaining that "the proponent is allowed to offer evidence of [ ] misconduct for any material purpose other than to show a mere propensity or disposition on the part of the defendant to commit the charged crime." Such evidence is admissible when it has "independent logical relevance" and when "its probative value is not substantially outweighed by the danger of unfair prejudice."[28] To summarize these requirements, we set forth five preconditions to admit evidence of other crimes under Rule 404(b): (1) the evidence must be material to an issue or ultimate fact in dispute in the case; (2) the evidence must be introduced for a purpose sanctioned by Rule 404(b), or to any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition; (3) the uncharged misconduct must be proved by plain, clear, and conclusive evidence; (4) the uncharged misconduct must not be too remote in time from the charged offense; and (5) the evidence must be weighed in terms of its probative value versus its unfairly prejudicial effect.[29] In addition, "[b]ecause such evidence is admitted for a limited purpose, the jury should be instructed concerning

the purpose for its admission as required by Delaware Rule of Evidence 105."[30]

Applying the *Getz* factors, this decision was not an abuse of discretion. First, the evidence of the uncharged November 1 drug transaction had independent logical relevance, because it tended to make it more probable that Torres supplied Morales with large amounts of cocaine. This was material to identifying Torres as part of a trafficking scheme. Second, the purpose of the evidence was to show a common scheme or plan to traffic in, and deliver, cocaine—a purpose permitted under Rule 404(b). Third, the transaction was proven through plain, clear, and convincing evidence. The State presented evidence of the transaction through Morales's trial testimony, wiretapped phone calls, and the actual cocaine seized from Willhide's apartment. Fourth, the uncharged misconduct was not too remote in time from the charged offenses. The November 1 delivery occurred only days after the charged offenses on October 21 and October 27. The November 1 delivery also took place in the course of the same ongoing dealer-distributor relationship between Morales and Torres.

Torres argues that the probative value of the evidence is outweighed by its prejudicial effect. He asserts that the probative value of the evidence is not strong because the State did not need the evidence of the

---

26. Del. R. Evid. 404(b).

27. *Getz v. State*, 538 A.2d 726, 730 (Del.1988).

28. *Id.* at 730; *accord* Del. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence."); Del. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or mislead-

ing the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.").

29. *Id.* at 734.

30. *Id.; accord* Del. R. Evid. 105 ("When evidence which is admissible as to 1 party or for 1 purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.").

uncharged November 1 transaction, because the State's case rested on the jury's determination of Morales's credibility. We disagree. The evidence of the November 1 transaction was critical to the State's case against Torres because (1) it tended to establish Torres's intent by showing a continuing plan to distribute cocaine; and (2) the wiretapped phone conversations between Morales and Willhide helped decode the language used between Morales and Torres to accomplish their drug distribution.

Torres also claims that the evidence would likely be misused by the jury for an improper purpose, such as to find that Torres had a propensity for dealing drugs, or to bolster the credibility of Morales. While evidence of uncharged misconduct inherently carries the danger of being used improperly, the danger was not high in this case because the evidence of the November 1 transaction is consistent with Morales's earlier testimony and the wiretapped calls played for the earlier transactions. Furthermore, this danger of misuse is properly dealt with by a limiting instruction.[31] Here, Torres rejected the subsequent acts instruction offered by the trial court. Therefore, Torres has waived any objection to the potential misuse of this evidence by the jury that might have been cured by such a limiting instruction.[32]

B. *The trial court did not err in allowing the State to elicit testimony from Grillo and Willhide as to the amount of cocaine they received from Morales in the past.*

 At trial, the State elicited testimony from Morales that he had been dealing cocaine in amounts in excess of a half kilogram for more than a year and that Torres was his supplier. After performing a *Getz* analysis, the trial court sustained Torres's objecting, finding that the unfair prejudice of the evidence substantially outweighed its probative value. The court explained that the focus of the State's evidence had to be on the transactions referred to in the wiretaps. The next day, the State elicited testimony from Morales and that he had a history of selling large amounts of cocaine to Grillo and Willhide, and that Torres was his supplier. Later, the prosecutor elicited testimony from Grillo that he had a history of regularly purchasing large amounts of cocaine from Morales prior to his arrest. Defense counsel objected and the court admonished the prosecutor to focus on the charged transactions. The prosecutor continued to inquire as to Grillo's prior practice of drug transactions with Morales and was admonished again. Torres asserts that the prosecutor continued to elicit such testimony from Grillo after the second admonition and, shortly thereafter, elicited similar evidence from Willhide. Torres claims that this testimony was in violation of the court's previous order, was not subjected to a *Getz* analysis and could only serve to lead a jury to conclude that because Torres sold drugs in the past, he likely acted in conformity with that character in the present case.

Torres contends it was improper for the trial court to allow the prosecutor to elicit testimony about the amounts of cocaine the witnesses received from Morales in the past. Since the prosecutor established that Torres was the source of Morales' cocaine, it was improper to present to the jury that Torres was the source of the

---

**31.** *See* DEL. R. EVID. 105; *Getz,* 538 A.2d at 734.

**32.** SUP.CT. R. 8 ("Only questions fairly presented to the trial court may be presented for review."); *Wainwright v. State,* 504 A.2d 1096, 1100 (Del.1986).

cocaine regularly purchased by Grillo and Willhide. Torres argues it was unfairly prejudicial and likely interpreted by the jury to believe that Torres had a significant prior history of drug dealing. Torres contends this evidence did not relate to any of the transactions referred to in the wiretap, and was in violation of the judge's ruling. He also argues that the prosecutor's pattern of overreaching by intentionally eliciting past drug dealing disregarded the court's repeated instructions made it more probable that the jury drew improper inferences and likely disregarded his presumption of innocence.

The State responds that its theory at trial was that Torres was part of a cocaine distribution chain and sold to Morales who, in turn, would sell to downstream dealers, such as Grillo and Willhide. Since police only found cocaine in the possession of Willhide and Grillo, the State argues that in order to establish Torres' guilt, the prosecution was required to demonstrate the cocaine ultimately found in the possession of Grillo and Willhide came from Torres. According to the State, the evidence was not admitted to show [Torres'] bad character, "but to set the context of the [cocaine dealing relationship]."[33] The State denies having violated the trial court's ruling because the prosecution did not "delve into any transactions 'not referred to in the wiretaps.'"

When the prosecutor's questioning of Grillo strayed to more general inquiries regarding the relationship between Grillo and Morales, Torres objected, the trial judge asked the prosecutor to move on to transactions associated with the wiretapped calls, and the prosecutor complied. Torres did not object at any other time;

therefore, we must review these for plain error.[34]

The trial judge's ruling on Torres's objection specifically related only to evidence of Morales's past relationship with Torres, not Grillo or Willhide. A reading of the transcript of Grillo and Willhide's direct examination indicates that the prosecutor's line of questioning was focused on ascertaining the amount of cocaine that Grillo and Willhide received from Morales on October 27 and November 1, respectively. In an effort to elicit this testimony, the prosecutor occasionally inquired how the amount at issue on those dates compared to the amounts the witnesses typical received from Morales. The prosecutor also established that both Grillo and Willhide had received cocaine from Morales before and inquired as to whether they were aware that Torres was Morales's supplier. This testimony was intended to establish the relationship between Grillo, Willhide and Morales, and Morales and Torres, in order to provide context to the jury. Although an objection could have been presented to the trial court, the trial court did not commit plain error in allowing the prosecutor to elicit this relevant information from Grillo and Wilhide.

## V. Cumulative effect of all errors denied due process

Torres contends that the cumulative effect of the errors in this case denied him a fair trial and due process. Torres did not present a cumulative error argument to the Superior Court; therefore his claim is now reviewed for plain error.[35] We have held that the cumulative impact of errors in a trial may be the basis for reversing a conviction, even where one error, standing

**33.** *Ashley v. State,* 1993 WL 397604 at *2 (Del.).

**34.** SUPR CT R. 8.

**35.** SUPR. CT R. 8.

alone, would not be the basis for reversal.[36] However, because we find that there was no error in this case, a cumulative error analysis is not warranted.

### VI. Conclusion

The judgments of the Superior Court are **AFFIRMED**.

**36.** *See Wright v. State,* 405 A.2d 685, 690 (Del.1979); *Robelen Piano Co. v. Di Fonzo,* 169 A.2d 240, 248 (Del.1961).