IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALLEN KEGLER, | § | |
| | § | No. 163, 2023 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No. 1706021159 A/B (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Appellee. | § | |

Submitted: May 31, 2024
Decided: August 14, 2024

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices.

## **ORDER**

After consideration of the appellant's Supreme Court Rule 26(c) briefs, the State's responses, and the record on appeal, it appears to the Court that:

(1) On September 23, 2022, a Superior Court jury found the appellant, Allen Kegler, guilty of second-degree burglary, aggravated menacing, second-degree conspiracy, possession of a firearm by a person prohibited ("PFBPP"), and two counts of possession of a firearm during the commission of a felony ("PFDCF"). The Superior Court sentenced Kegler to thirty years of Level V incarceration, suspended after thirteen years for decreasing levels of supervision. This is Kegler's direct appeal.

(2) On appeal, Kegler's trial counsel ("Trial Counsel") filed a brief and a motion to withdraw under Supreme Court Rule 26(c). Kegler submitted points, which included a claim that his speedy trial rights were violated. The State responded and moved to affirm the Superior Court's judgment. Unable to conclude that Kegler's appeal could be decided without adversary presentation, the Court granted Trial Counsel's motion to withdraw and appointed substitute counsel ("Substitute Counsel") to represent Kegler on appeal. The Court directed Substitute Counsel to brief the alleged violation of Kegler's right to a speedy trial as well as any other issues raised by the record.

(3) On May 13, 2024, Substitute Counsel filed a brief and motion to withdraw under Rule 26(c). Substitute Counsel asserted that, based upon a complete and careful examination of the record, he could not argue that there was a violation of Kegler's right to a speedy trial. He further stated that there were no other arguably appealable issues. He informed Kegler of the provisions of Rule 26(c) and provided Kegler with a copy of the motion to withdraw and the accompanying brief. He also informed Kegler of his right to identify any points that he wished this Court to consider on appeal. Kegler submitted points for this Court's consideration. The State responded to the Rule 26(c) brief and moved to affirm the Superior Court's judgment.

(4) The evidence presented at trial established that, at approximately 11:00 p.m. on June 26, 2017, D'Andre Murphy and Brianna Dupree-Scott were in their apartment in the Mill Creek Apartment Complex, which is located in Wilmington. While Murphy was taking a bath, Dupree-Scott started to exit the apartment to retrieve Murphy's hairbrush from his car. When she opened the door, two unmasked men were outside. The men, who were unfamiliar to her, seemed surprised to see her. Dupree-Scott described one of the men as having lighter skin, shoulder-length locks, and facial tattoos. She identified Kegler as that man. She also testified that Kegler was holding a gun.

(5) The men told Dupree-Scott to get on the floor. She initially thought that they were joking, but the darker-skinned man grabbed her ponytail to bring her down to the floor and then dragged her through the apartment. She did not remember the intruders saying anything other than telling her to get on the ground and asking her where the knife was. She could not recall the men taking anything. When Dupree-Scott screamed for help, Murphy ran out of the bathroom and tackled Kegler. The darker-skinned man joined the struggle and everyone ended up outside of the apartment in the hallway. As Murphy and Kegler fought over the gun, Dupree-Scott tried to pull Kegler's hair so he would get off Murphy.

(6) Becoming scared, Dupree-Scott ran back into the apartment and heard a gunshot. Murphy came to the door and said that he had been shot. He had a bullet

3

wound in his left hip and spent two days in the hospital. He did not testify at trial. Dupree-Scott, who saw one of the intruders flee through the back door of the building, called 911.

(7) New Castle County police responded to the 911 call and launched an investigation. Evidence detection unit officers lifted latent fingerprints from the interior of the front common door to the apartment building. A fingerprint expert testified that some of the lifted fingerprints matched Kegler's fingerprints. Upon learning of the fingerprint match, Detective David DiNardo investigated whether Kegler was a resident of the apartment building and determined that he was not.

(8) Detective DiNardo obtained a photograph of Kegler, which he showed to Dupree-Scott as part of a six-photograph array. Dupree-Scott identified Kegler as the intruder who had the gun. Within a week of the shooting, the owner of a house located near the apartment complex contacted the police about a gun he had just discovered in his backyard. The police collected the gun, which was a revolver, the type of gun that the police suspected had been used in the shooting because no casings were found at the crime scene. The resolver was rusty and had six casings, one of which had been fired. No fingerprints were detected on the revolver. DNA testing of the revolver was also unsuccessful.

(9) At the close of the State's case, Kegler unsuccessfully moved to dismiss all the charges based on insufficient evidence. With the State's agreement, the

4

defense called Detective DiNardo to testify about showing the photographic lineup to a person who lived in the apartment complex and told police that she saw someone outside the back of one of the buildings the afternoon before the shooting with a hairstyle similar to what Dupree-Scott described to police. This person selected another photograph—not Kegler's—as the man she observed. The police had no information suggesting that the man, whose photograph was randomly generated as having features similar to Kegler, had any connection to the case. Kegler testified that he lived in Pennsylvania, had no ties to Delaware (other than a cousin he once visited), and had never been to Mill Creek Apartment Complex. He denied being in Delaware at the time of the crimes.

(10) After the close of evidence, the State moved to amend the indictment to conform to the evidence by changing first-degree robbery to attempted first-degree robbery. The motion was based on Dupree-Scott's testimony that she did not recall the intruders taking anything. Trial Counsel opposed the motion, arguing that it would prejudice Kegler's rights because the trial was based on the original indictment. The Superior Court granted the motion to amend the indictment. In addition, the court granted Kegler's request to include jury instructions for first-degree burglary and second-degree burglary as lesser-included offenses of home invasion and for aggravated menacing as a lesser-included offense of attempted first-

5

degree robbery. During deliberations, the court denied the jury's request for copies of Detective DiNardo's police report and Dupree-Scott's statement to police.

(11) The jury found Kegler guilty of second-degree burglary as a lesser-included offense of home invasion, aggravated menacing as a lesser-included offense of attempted first-degree robbery as to Dupree-Scott, second-degree conspiracy, and two counts of PFDCF relating to the second-degree burglary and aggravated menacing convictions. The jury found Kegler not guilty of attempted first-degree robbery as to Murphy, first-degree assault and second-degree assault as to Murphy, and PFDCF as to the assault charges. The same jury then considered the PFBPP charge and found Kegler guilty of that charge. On May 2, 2023, the Superior Court sentenced Kegler. This appeal followed.

(12) When reviewing a motion to withdraw and an accompanying brief under Rule 26(c), this Court must: (i) be satisfied that defense counsel has made a conscientious examination of the record and the law for arguable claims; and (ii) conduct its own review of the record and determine whether the appeal is so totally devoid of at least arguably appealable issues that it can be decided without an adversary presentation.[1] Kegler's arguments on appeal may be summarized as follows: (i) the arrest warrant was not issued until after he was arrested; (ii) his right to a speedy trial was violated; (ii) the State withheld evidence in violation of *Brady*

---

[1] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *Leacock v. State*, 690 A.2d 926, 927–28 (Del. 1996).

*v. Maryland*[2] and planted the fingerprints; (iii) there was prosecutorial misconduct during the trial; (iv) the Superior Court erred in granting the State's motion to amend the indictment; (v) the Superior Court erred in denying the jury's request for Detective DiNardo's police report and Dupree-Scott's statement to police; (vi) there was insufficient evidence to support his convictions; (vii) he was over-sentenced; and (viii) Trial Counsel was ineffective.

(13) Kegler did not challenge the arrest warrant below, so we review for plain error.[3] Kegler mistakenly contends that the arrest warrant was not issued until after his arrest. The arrest warrant was authorized on June 29, 2017. Delaware police did not have a chance to arrest Kegler because Pennsylvania police arrested him for other charges on June 30, 2017. Delaware police interviewed Kegler in Pennsylvania. While Kegler was held in Pennsylvania on default of bail, a New Castle County grand jury indicted him for multiple crimes arising from the Mill Creek Apartment Complex shooting. On July 24, 2017, a warrant for Kegler's arrest was issued under Superior Court Criminal Rule 9(b). Upon release from his incarceration in Pennsylvania, Kegler was arrested and the Rule 9 warrant was returned to the Superior Court on April 6, 2021. There is no merit to Kegler's claim that the arrest warrant was issued after his arrest.

---

[2] 373 U.S. 83 (1963).
[3] Supr. Ct. R. 8.

7

(14) We next address Kegler's claim that his right to a speedy trial was violated. He did not assert his right to a speedy trial in the Superior Court so we again review for plain error.[4] Plain error "is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[5] Regardless of whether Kegler is relying on the Uniform Agreement on Detainers ("UAD") or his constitutional right to a speedy trial, there is no plain error here.

(15) Under the UAD, the State may, but is not required to, send a written request to the state where a defendant is imprisoned to obtain temporary custody so that the State can try him here.[6] If the State obtains temporary custody of the prisoner, trial shall take place within 120 days unless a continuance is granted for good cause.[7] Alternatively, the out-of-state defendant can ask to be transferred to Delaware for final disposition of his case.[8] Trial then must take place within 180 days unless a continuance is granted for good cause.[9] Neither the State nor Kegler invoked these provisions, and the UAD trial deadlines therefore were not triggered.

---

[4] Supr. Ct. R. 8; *Page v. State*, 934 A.2d 891, 896 (Del. 2007).

[5] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

[6] 11 *Del. C.* § 2543(a); *Pittman v. State*, 301 A.2d 509, 512 (Del. 1973).

[7] *Id.* § 2543(c).

[8] *Id.* § 2542(a).

[9] *Id.*

(16) To determine whether Kegler's constitutional right to a speedy trial was violated, we use the four-factor balancing test set forth in *Barker v. Wingo*.[10] The four factors are the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant.[11] The factors are related and no one factor is conclusive.[12]

(17) A defendant's right to a speedy trial "attaches as soon as the defendant is accused of a crime through arrest or indictment, whichever occurs first."[13] Unless the length of delay is determined to be "presumptively prejudicial," it is not necessary to consider the additional *Barker* factors.[14] If the delay between arrest or indictment and trial exceeds one year, this Court will generally consider the additional factors.[15]

(18) The delay in this case was presumptively prejudicial because more than one year passed between the indictment (July 24, 2017) and the commencement of trial (September 20, 2022). Even if the time Kegler was incarcerated in Pennsylvania is not counted toward the delay, more than one year still elapsed between Kegler's return to Delaware on April 6, 2021 and the start of his trial on September 20, 2022.

---

[10] 407 U.S. 514 (1972). *See also Johnson v. State*, 305 A.2d 622, 623 (Del. 1973) (adopting *Barker* test)).

[11] *Barker*, 407 U.S. at 530.

[12] *Id.* at 533.

[13] *Middlebrook v. State*, 802 A.2d 268, 273 (Del. 2002).

[14] *Id.*

[15] *Cooper v. State*, 32 A.3d 988, 2011 WL 6039613, at *7 (Del. Dec. 5, 2011) (TABLE).

COVID-19 restrictions were the primary reason for the delay between April 6, 2021 and September 20, 2022. A judicial emergency in place during that time tolled the time requirements under the Speedy Trial Guidelines until July 13, 2021.[16]

(19)  Under the judicial emergency, the Speedy Trial Guidelines did not apply to cases, like Kegler's, that were pending between March 16, 2020, and December 31, 2021. The Superior Court was directed to "prioritize such cases" as it determined "to be in the best interests of justice and of allowing for the prompt and efficient management of the caseload resulting from the COVID-19 pandemic."[17]  Following Kegler's arraignment on March 29, 2022, trial was scheduled for August 2022. After continuances requested by Trial Counsel and the State, trial commenced on September 20, 2022. The reasons for the delay are not primarily attributable either to the State or to Kegler.

(20)  Because Kegler did not assert his right to a speedy trial in the Superior Court, this factor weighs in favor of the State. The last *Barker* factor—prejudice to the defendant—also weighs in the State's favor. Kegler has not identified any prejudice that he suffered from the delay or shown that the delay impaired his defense. Considering Murphy's absence from the trial and the jury acquitting Kegler

---

[16] Administrative Order No. 22 ¶¶ 1, 3 (June 9, 2021) (tolling the time requirements under the Speedy Trial Guidelines until July 13, 2021); Order (Mar. 13, 2020) (declaring a judicial emergency effective March 16, 2020 and tolling the time requirements under the Speedy Trial Guidelines).

[17] Administrative Order No. 22 ¶ 3; Administrative Order No. 22 Ex. 1 § (a)(iv).

of the charges involving Murphy, it appears that Kegler actually may have benefitted from the delay. Having considered the *Barker* factors, we conclude that there was no violation of Kegler's constitutional right to a speedy trial.

(21) In arguing that the State violated *Brady* by withholding exculpatory information regarding Murphy's identification, Kegler confuses Murphy with the woman who identified a different man in a photographic lineup as the man she observed outside one of the apartment buildings on the afternoon before the shooting.[18] Kegler, however, insists that the police fabricated the woman's identification and that Murphy identified someone other than Kegler in the photographic lineup shown to him. The record, including the hospital records Kegler appears to rely upon for this claim, does not show that Murphy identified anyone involved in the shooting. Other than the medical records, Kegler points to nothing that supports his *Brady* claim, and we conclude that this claim is without merit.

(22) Similarly, Kegler does not identify anything to support his claim that the police lied about or planted the fingerprints lifted from the common front door to the apartment building. Consistent with the photographs of the door, police officers testified that fingerprints were lifted from above and below the push bar. Some of the lifted fingerprints matched Kegler's fingerprints.

---

[18] *See supra* ¶ 9.

(23)   Because Kegler did not raise his claims of prosecutorial misconduct in the Superior Court, we review for plain error.[19]   When reviewing a prosecutorial misconduct claim for plain error, we first review the record *de novo* to determine whether misconduct occurred.[20]   If we determine that no misconduct occurred, our analysis ends.   If we find misconduct, then the error must be "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[21]

(24)   In his first claim of prosecutorial misconduct, Kegler alleges that the State tampered with the audio recording of his interview with police to change the order of his statements and to make it look like he said things that he did not say. The trial transcript reflects that the prosecutor and Trial Counsel agreed on a redacted version of the recording to be played at trial.   There is no sign of improper tampering with the recording.

(25)   Kegler next argues that the prosecutor engaged in misconduct by showing the jury the gun found a week after the incident at trial.   Kegler argues that there was no evidence that the gun was used in the shooting.   Kegler ignores that the gun (i) was a revolver, the type of gun that the police suspected had been used in the shooting because no casings were found at the crime scene, (ii) had six casings, one of which had been fired, and (iii) was discovered near the apartment complex a week

---

[19] Supr. Ct. R. 8; *Baker v. State*, 906 A.2d 139, 150 (Del. 2006).
[20] *Torres v. State*, 979 A.2d 1087, 1094 (Del. 2009).
[21] *Id.*

12

after the shooting. The prosecutor, who elicited testimony concerning the lack of DNA and fingerprints on the gun and acknowledged that it was not certain the gun was used in the shooting, did not commit prosecutorial misconduct by showing the gun (primarily through photographs) to witnesses as he questioned them.

(26) Finally, Kegler claims that the prosecutor committed misconduct by telling the jury that Kegler shot Murphy, fled the apartment building, and discarded the gun. The prosecution cannot intentionally "misstate the evidence or mislead the jury as to the inferences it may draw,"[22] but can argue "legitimate inferences that . . . flow from the evidence presented."[23] In arguing that the evidence, including Dupree-Scott's testimony and the lifted fingerprints, demonstrated that Kegler shot Murphy, fled the apartment building, and threw the gun away, the prosecutor argued legitimate inferences flowing from the evidence presented.

(27) The Superior Court did not err in granting, over Trial Counsel's objections, the State's motion to amend the indictment to conform to the evidence by changing first-degree robbery to attempted first-degree robbery.[24] We review the Superior Court's decision for abuse of discretion.[25] Under Superior Court Criminal

---

[22] *Hughes v. State*, 437 A.2d 559, 567 (Del. 1981).

[23] *Burns v. State*, 76 A.3d 780, 789 (Del. 2013).

[24] Kegler also seems to argue that the indictment was wrongly amended to include Dupree-Scott as a victim. He is mistaken. The original indictment named Dupree-Scott or her residence in the home invasion, first-degree burglary, and first-degree robbery charges, which were incorporated into the PFDCF and second-degree conspiracy charges.

[25] *Coffield v. State*, 794 A.2d 588, 590–91 (Del. 2002).

13

Rule 7(e), amendment of an indictment any time before the verdict is permissible "if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."[26] In general, "an amendment to an indictment charging a defendant with a lesser-included offense [of the original charge] does not violate Rule 7(e)."[27] As this Court has explained, such an amendment does not mean that the defendant is being charged with an additional or different offense.[28]

(28) Because attempted first-degree robbery is a lesser-included offense of first-degree robbery,[29] Kegler was not charged with an additional or different offense as a result of the indictment's amendment. Nor did the amendment prejudice Kegler's substantial rights. His defense at trial was that he was not in Delaware at the time of the crimes and had never been to the Mill Creek Apartment Complex, not that he was in Dupree-Scott's apartment but failed to take anything.[30] The

---

[26] Super. Ct. Crim. R. 7(e).

[27] *Smiley v. State*, 2024 WL 2744562, at *3 (Del. May 28, 2024) (affirming the Superior Court's amendment of indictment to decrease third-degree rape to the less-included offense of fourth-degree rape). *See also Shockley v. State*, 854 A.2d 1159, 2004 WL 1790198, at *2 (Del. Aug. 2, 2004) (TABLE) (holding that the Superior Court did not err in permitting amendment of the indictment to charge the defendant with a lesser-included offense); *Rogers v. State*, 839 A.2d 666, 2003 WL 22957024, at *2 (Del. Dec. 12, 2003) (TABLE) (holding that the Superior Court properly exercised its discretion to permit the State to amend the indictment to charge the defendant with a lesser-included offense of the original charge).

[28] *Smiley*, 2024 WL 2744562, at *3.

[29] 11 *Del. C.* § 206(b)(2) (providing that an offense is included when "[i]t consists of an attempt to commit the offense charged").

[30] *See, e.g., Roberts v. State*, 710 A.2d 218, 1998 WL 231269, at *1 (Del. May 1, 1998) (TABLE) (holding the amendment of indictment to replace "U.S. currency and/order or other valuables" with "property" did not affect the defendant's substantial rights because his defense at trial was that the incident never occurred).

amendment of the indicted first-degree robbery charge to the lesser-included offense of attempted first-degree robbery therefore was permissible.

(29) In arguing that the Superior Court should have granted the jury's request during deliberations for Detective DiNardo's police report and Dupree-Scott's statement to police, Kegler ignores that Trial Counsel and the prosecutor agreed that those materials should *not* be provided to the jury. Trial Counsel and the prosecutor also agreed with the trial judge's proposed response denying the jury's request.[31] Accordingly, Kegler's argument is without merit.

(30) We next turn to Kegler's claim that there was insufficient evidence to support his convictions. The Court reviews an insufficiency-of-evidence claim *de novo* to determine whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the defendant guilty beyond a reasonable doubt.[32]

(31) At the time of the June 26, 2017 incident, a person was guilty of second-degree burglary when they knowingly entered or remained unlawfully in a dwelling with the intent to a commit a crime.[33] A dwelling is a building that is usually

---

[31] The agreed-upon response was:

> Thank you for your note. The only evidence that may be considered is the evidence presented during trial and brought back to you for deliberation. As set forth in the jury instructions, you should be guided by your own recollection.

App. to R. 26(c) Br. at A649.

[32] *Farmer v. State*, 844 A.2d 297, 300 (Del. 1990).

[33] 11 *Del. C.* § 825(a)(1) (effective between July 12, 2004 and Sept. 15, 2019).

occupied by a person lodging there at night, which is the period thirty minutes after sunset and thirty minutes before sunrise.[34]   Given Dupree-Scott's testimony concerning how Kegler and another man forced their way into her apartment around 11:00 p.m. and the subsequent altercation that resulted in Murphy being shot, as well as the fingerprint evidence, a rational trier of fact could find Kegler guilty beyond a reasonable doubt of second-degree burglary.  The trial testimony that Murphy was selling drugs from the apartment does not change this result.

(32)   A person is guilty of aggravated menacing when they intentionally place another person in fear of imminent physical injury by displaying a deadly weapon.[35]  Dupree-Scott testified that Kegler displayed a gun as he forced his way into her apartment.  In addition, Kegler's fingerprints were found on the door to the building where Dupree-Scott lived and a gun was found near the apartment complex a week later.  In arguing that the jury was required to find him not guilty of aggravated menacing because it found him not guilty of first-degree assault, Kegler ignores that the elements and victims of these crimes were different.[36]  A rational

---

[34] 11 *Del. C.* § 829(b), (f).

[35] 11 *Del. C.* § 602(b).  Theft is not an element of aggravated menacing as Kegler suggests.

[36] *Compare* 11 *Del. C.* § 602(b) ("A person is guilty of aggravated menacing when by displaying what appears to be a deadly weapon that person intentionally places another person in fear of imminent physical injury.") *with* 11 *Del. C.* § 613(a)(1), (4) (providing that a person is guilty of first-degree assault when they intentionally cause physical injury to another person with a deadly weapon or when they intentionally or recklessly cause serious injury to person while committing or fleeing from commission of a felony).  Murphy (who did not appear at trial) was the named victim of the first-degree assault charges, and Dupree-Scott (who did testify at trial) was the named victim of the aggravated menacing charge.  The jury found Kegler not guilty of the assault charges

16

trier of fact could find that the State had proven beyond a reasonable that Kegler was guilty of aggravated menacing.

(33)   To prove that Kegler was guilty of second-degree conspiracy, the State had to establish that Kegler, intending to promote or facilitate the commission of home invasion, burglary, robbery, or aggravated menacing, agreed with another person to commit one more of those crimes and Kegler or the other person committed an overt act in pursuit of the conspiracy.[37]   Dupree-Scott testified that Kegler and another man forced their way into her apartment and fought with Murphy.   A rational trier of fact could find Kegler guilty beyond a reasonable doubt of second-degree conspiracy.

(34)   For PFDCF, the State had to establish that Kegler possessed a firearm during his commission of home invasion, burglary, robbery, or aggravated menacing.[38]   For PFBPP, the State had to establish that Kegler knowingly possessed a firearm and was prohibited by law from doing so.   Dupree-Scott testified that Kegler displayed a gun when he forced his way into her apartment.   Kegler stipulated

---

involving Murphy and guilty of the aggravated menacing charge involving Dupree-Scott.   The difference in elements, victims, and verdicts also means that there was no double-jeopardy violation as Kegler contends.   *See, e.g., McGuinness v. State*, 312 A.3d 1156, 1198 (Del. 2024) ("Because each statute at issue requires 'proof of facts not necessary to complete the other,' they can 'support separate convictions and punishments without offending the Double Jeopardy Clauses.'") (quoting *White v. State*, 243 A.3d 381, 399 (Del. 2020)); *Chandler v. State*, 2015 WL 733633, at *1 (Del. Feb. 19, 2015) (holding that there was no double-jeopardy violation where the defendant's sentences for robbery and aggravated menacing involved two different victims).

[37] 11 *Del. C.* § 512.

[38] 11 *Del. C.* § 1447A(a).

that he was prohibited by law from owning or possessing a firearm. Notwithstanding the absence of fingerprints on the gun discovered near the apartment complex and the possibility that the gun might be inoperable, a rational jury could find that Kegler was guilty beyond a reasonable doubt of PFDCF and PFBPP.[39]

(35)  As to Kegler's claim that he was over-sentenced, our review of sentences is extremely limited.[40]  If the sentence falls win statutory limits, we consider only whether it is based on factual predicates that are false, impermissible, or lack minimal reliability, judicial vindictiveness or bias, or a closed mind.[41] Kegler's sentences for PFBPP (ten years of Level V incarceration, suspended after the five-year minimum mandatory for decreasing levels of supervision),[42] each count of PFDCF (three years of Level V incarceration),[43] second-degree burglary (eight years of Level V incarceration, suspended after one year for one year of Level III

---

[39] *See* 11 *Del. C.* § 222(13) (defining firearm as including "any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, *whether operable or inoperable*, loaded or unloaded") (emphasis added).  *See also Poon v. State*, 880 A.2d 236, 239 (Del. 2005) (holding that a rational jury could rely on eyewitness testimony to find PFDCF beyond a reasonable doubt even though no firearm was recovered).

[40] *Mayes v. State*, 604 A.2d 839, 842 (Del. 1992).

[41] *Weston v. State*, 832 A.2d 742, 746 (Del. 2003).

[42] PFBPP is a class C felony, which has sentencing range of up to fifteen years of Level V incarceration, with a five-year minimum mandatory sentence when the defendant has committed that crime within ten years of the date of conviction for any violent felony or the date of termination of all periods of incarceration or confinement for that conviction, whichever is the later date.  11 *Del. C.* § 1448(e)(1)(b); 11 *Del. C.* § 4205(b)(2).  At sentencing, the parties stipulated that Kegler was subject to sentencing under Section 1448(e)(1)(b).

[43] PFDCF is a class B felony, which carries a sentencing range of three to twenty-five years of Level V incarceration.  11 *Del. C.* § 1447A; 11 *Del. C.* § 4205(b)(2).

probation),[44] aggravated menacing (five years of Level V incarceration, suspended after one year for one year of Level III probation),[45] and second-degree conspiracy (one year of Level V incarceration, suspended for one year of Level III probation)[46] fall within statutory limits. He has not identified, and the record does not reflect, any reliance on improper factual predicates, judicial vindictiveness or bias, or exhibition of a closed mind during his sentencing.

(36) In its response to Trial Counsel's Rule 26(c) brief, the State noted that the second-degree conspiracy sentence in the sentencing order is inconsistent with the sentence imposed by the Superior Court during sentencing. At the sentencing hearing, the Superior Court sentenced Kegler to one year of year of Level V incarceration, suspended for one year of Level III probation. The sentencing order, however, describes the sentence for second-degree conspiracy as two years of Level V incarceration, suspended for one month of Level III probation. Relying on this Court's decision *Puller v. State*,[47] the State suggests that the Court remand the matter to the Superior Court to conform the sentencing order with the oral pronouncement of sentence.

---

[44] Second-degree burglary is a class D felony, which carries a sentencing range of up to eight years of Level V incarceration. 11 *Del. C.* § 825; 11 *Del. C.* § 4205(b)(4).

[45] Aggravated menacing is a class E felony, which carries a sentencing range of up to five years of Level V incarceration. 11 *Del. C.* § 602(b); 11 *Del. C.* § 4205(b)(5).

[46] Second-degree conspiracy is a class G felony, which carries a sentencing range of up to two years of Level V incarceration. 11 *Del. C.* § 512; 11 *Del. C.* § 4205(b)(7).

[47] 291 A.3d 652, 2023 WL 1099179 (Del. Jan. 27, 2023) (TABLE).

(37)   In *Puller*, the sentencing transcript reflected that the Superior Court sentenced the defendant to life imprisonment for attempted first-degree murder under Section 4205(b)(1), which provided for a sentencing range between fifteen years of Level V incarceration and life imprisonment.  The sentencing order incorrectly referred to Section 4209(d)(2), which required the imposition of life imprisonment for first-degree murder.  Resolving this inconsistency, we concluded:

> "Federal courts have consistently held that when there is a direct conflict between an unambiguous oral pronouncement of a sentence and the written judgment, the oral pronouncement controls."  This Court has not adopted the federal rule, but has recognized that "Delaware statutory and case law authorize sentence correction for errors resulting from 'oversight or omission.'"  The Superior Court may, at any time, correct "[c]lerical mistakes in judgments, orders or other parts of the records and errors in the record arising from oversight of omission."  We therefore affirm the Superior Court's denial of Puller's motion for correction of illegal sentence, but remand this matter to the Superior Court to correct the clerical error in the sentencing order.[48]

We agree with the State's recommendation in this case and will remand the matter to the Superior Court for the limited purpose of issuing a corrected sentencing order.

(38)   Kegler's remaining claims are based on the alleged ineffectiveness of his Trial Counsel.  We have consistently held that we will not consider ineffective assistance of counsel claims for the first time on direct appeal, and we decline to do so here.[49]

---

[48] *Id.* at *2.

[49] *Desmond v. State*, 654 A.2d 821, 829 (Del. 1994).

20

(39) This Court has reviewed the record carefully and has concluded that Kegler's appeal is wholly without merit and devoid of any arguably appealable issue. We also are satisfied that Substitute Counsel has made a conscientious effort to examine the record and the law and has properly determined that Kegler could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that this matter is remanded to the Superior Court for correction of the clerical error in the sentencing order. In all other respects, the judgment of the Superior Court is AFFIRMED. The motion to withdraw is moot. Jurisdiction is not retained.

BY THE COURT:

*/s/ Abigail M. LeGrow*
Justice

21