IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KARIEEM J. HOWELL, | § | |
| | § | No. 372, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID No.   1802010652(N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: September 29, 2021
Decided:    December 14, 2021

Before **SEITZ,** Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court.  **REVERSED AND REMANDED.**

Joseph A. Hurley, Esquire, Wilmington, Delaware, *for Appellant Karieem Howell.*

Carolyn S. Hake, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Appellee State of Delaware*.

**TRAYNOR**, Justice:

At the heart of the State's prosecution of Karieem Howell for numerous drug and weapons offenses stood the testimony of Brian Caldwell, a witness who had agreed to cooperate with the prosecution in return for a favorable plea agreement. It is permissible, of course, for the trier of fact in a criminal case to consider a witness's agreement to testify for the prosecution in exchange for favorable treatment in the witness's separate case when assessing the witness's credibility. Yet during Howell's trial, the trial judge instructed Howell's jurors, at the beginning of Caldwell's damning testimony, that they could *not* consider Caldwell's agreement with the prosecution in weighing his credibility.

That the court's instruction was legally erroneous the State concedes. But, because Howell's lawyer did not object to the instruction, we may only review the mistake for plain error—that is, error that so affected Howell's substantial rights that his failure to object is excused. The State contends that the strength of the evidence independent of Caldwell's testimony and the correct instructions regarding witness credibility provided to the jury at the close of evidence suffice to erase any prejudice that Howell might have suffered because of the erroneous instruction.

Our review of the trial record persuades us otherwise. Caldwell's testimony was pivotal evidence upon which the jury's determination of key elements of the crimes charged likely turned. Those issues include the quantity of marijuana Howell

possessed, his delivery of the marijuana to others, and his knowing possession of an illegal firearm. Without Caldwell's testimony, the prosecution's case was susceptible to doubt; with it—*if the jury found it credible*—the likelihood of conviction increased dramatically. The trial court's instruction, however, unduly restricted the jury's assessment of Caldwell's credibility and undermined the fairness of Howell's trial. Therefore, we reverse his convictions and remand to the Superior Court for a new trial.

## I. BACKGROUND

Howell and his co-defendants—his brother Malique, mother Sharon, and cousin Harrison Dorsey—were indicted on multiple charges of drug dealing and possession of a firearm during the commission of a felony (PFDCF), single counts of conspiracy and possession of a weapon with an obliterated serial number, and two misdemeanor drug charges. The indictment was the product of a joint investigation by the Delaware State Police and the New Castle County Police Department, which culminated on February 16, 2018 in the execution of search warrants at two New Castle County residences: one at 12 Bradbury Drive in New Castle—Sharon's home—and the other at 23 Aldershot Drive in Newark, where Howell and Malique lived.

3

### A. The Bradbury Search

Detective Patrick McAndrew of the Delaware State Police, the investigation's chief officer, executed the search warrant at 12 Bradbury. He first went to the "back bedroom"[1] where he found an illegal sawed-off shotgun next to the bed and a handgun on the nightstand. He also found and seized $2,406 in cash from a bureau in the bedroom.

Detective McAndrew then went to the basement where he noticed "an area that appeared to be designated as a bedroom."[2] On one of the bedroom's walls hung "curved letters . . . that said Reem,"[3] which the detective understood to stand for Karieem. About ten feet from the bedroom in an unfinished area sat a picnic table that, to Detective McAndrew, "appeared to be a drug packaging and resale location. . . ."[4] On the table were a vacuum-sealer machine, multiple freezer bags, many of which appeared to have marijuana residue either on or in them. Although McAndrew described the residue—he referred to it as "shake"—as a "large quantity of green marijuana pieces,"[5] the amount of marijuana recovered in this search was immeasurably small. Though virtually empty when he seized them, the freezer bags (according to McAndrew, there were "upwards of 100" of them[6]) were capable of

---

[1] *State v. Howell*, No. 1802010652(N), Trial Tr. at 54, Mar. 13, 2019.
[2] *Id.* at 59.
[3] *Id.*
[4] *Id.* at 60.
[5] *Id.*
[6] *Id.* at 61.

holding "about a pound of marijuana."[7]  McAndrew also found a large chest that contained ammunition, an assault rifle magazine, a handgun holster, and "a large quantity of small particles of marijuana."[8]

**B.    The Aldershot Search**

Detective Michael Macauley, also of the Delaware State Police, executed the search warrant along with other officers at 23 Aldershot, a split-level house approximately 50 yards from an elementary school, which Howell rented and where he and Malique were then living.  The Superior Court summarized the searching officers' haul at 23 Aldershot:

> In the basement of that residence, police found 28 grams of marijuana in a clear plastic bag, a cigar blunt, and $1,300 in cash, along with a 9 millimeter handgun.  The handgun had an extended magazine and an obliterated serial number.  The part of the gun where the serial number was removed visibly was discolored and "clearly . . . altered."  In the basement bedroom, police found a digital scale, a grinder with marijuana residue, $2,300 in cash, 57 grams of marijuana, and a box of ammunition containing various brands of 9 millimeter ammunition. Police found Malique's passport in a drawer in that basement bedroom. The basement bedroom closet also contained several vacuum sealer bags that were empty but appeared to have been used previously.
>
> In the upstairs bedroom of 23 Aldershot, police found a passport and vehicle title belonging to Howell.  In a hallway closet adjacent to that bedroom, police located $24,000 in cash and a blue backpack containing Howell's driver's license, social security card, and medical cards, along with a box containing 9 millimeter, .40 caliber, .45 caliber, and .223 caliber ammunition.  A money counter also was found in that closet.  Outside 23 Aldershot, behind a shed in the backyard, the police

---

[7] *Id*. at 64.
[8] *Id.* at 60.

5

found four firearms, including two shotguns, a .223 caliber rifle, and a .22 caliber rifle.[9]

## C. Howell's Arrest

Later that day, Detective McAndrew applied for, and the Justice of the Peace granted, a warrant for Howell's arrest. The affidavit of probable cause attached to the warrant application focused exclusively on what was found at 23 Aldershot; it did not mention the search at 12 Bradbury. Accordingly, the complaint[10] accompanying the warrant consisted of seven charges, all alleged to have been committed at 23 Aldershot. The charges ranged from drug dealing—specifically, possession with intent to deliver 132 grams of marijuana—to possession of a firearm with an obliterated serial number. Five days later, Howell turned himself in and was arrested on this warrant.

## D. Caldwell's Arrest

Less than a week after the simultaneous searches of 12 Bradbury and 23 Aldershot and the day after Howell's arrest, the police raided the home of Brian Caldwell, seizing 340 grams (or 12 ounces) of marijuana, $11,400 in cash, and used plastic vacuum-sealer bags with markings similar to those on the bags found at 12

---

[9] *Howell*, 2020 WL 1492787, at *2 (footnotes omitted).
[10] According to Justice of the Peace Court Criminal Rule 4, "[t]he complaint is a written statement of the essential facts constituting the offense charged. . . ." By statute, "the complaint shall be attached to the [arrest] warrant." 11 *Del. C.* § 5906(d).

6

Bradbury. The police arrested Caldwell, a development that did not bode well for Howell.

When the police interviewed Caldwell on the night of his arrest, he admitted that he purchased marijuana—a pound to two pounds at a time—for resale. But Caldwell did not say how frequently he purchased marijuana. And, although he told the interviewing officer the nicknames of his supplier, the record does not disclose that nickname.

Four months later, things changed. According to Howell's counsel, "[i]n June, Mr. Caldwell, with counsel, comes forward and wants to be a cooperating witness, and he provides a second video statement, which is parallel[] in many respects to that which was given in February, but is contradictory in other respects that are material to his credibility."[11]

As far as we can tell, neither Caldwell's February 22 statement nor his June statement are part of the record in this case.[12] But it would appear that, at the very least, when Caldwell spoke with the police officers in June, having expressed his desire to cooperate, he fingered Howell as his supplier and tied him to the drug dealing operation, evidence of which the police found during their search of the two residences. We derive that conclusion from the fact that, when Howell was arrested

---

[11] App. to Opening Br. at A21.
[12] Three brief, marginally relevant snippets from the February statement were played for the jury and introduced as Court Exhibits 2, 3, and 4.

in February, he was only charged with offenses tied to 23 Aldershot. But when the State sought, and the grand jury returned, Howell's indictment in July of 2018, it included weapons charges related to the weapons seized at the Bradbury property. And a month later, Howell was reindicted, this time under an indictment that included drug dealing charges related to activity at both 12 Bradbury and 23 Aldershot. As will be seen, Caldwell's trial testimony was instrumental in linking Howell to the drug dealing enterprise, including the activity at 12 Bradbury.

### E.    Scheduling Issues

In early January 2019, Howell's three co-defendants entered into plea agreements, acknowledging varying levels of culpability in the drug dealing operation that gave rise to Howell's indictment. Howell's mother, Sharon, pleaded guilty to three felonies—drug dealing, conspiracy in the second degree, and possession of a destructive weapon. His brother, Malique, pleaded guilty to two felonies—possession of a firearm during the commission of a felony and drug dealing. And Harrison Dorsey entered a plea of guilty to a misdemeanor-level conspiracy.

By contrast, Howell was determined to go to trial, which was scheduled to begin on January 23, 2019. By that time, Howell's indictment had been refined to include drug dealing and weapons charges linked to both 12 Bradbury and 23 Aldershot. Specifically, Howell faced three drug dealing counts, seven PFDCF

8

counts, three counts of possession of a firearm by a person prohibited, two counts of possession of drug paraphernalia, single counts of conspiracy in the second degree, possession of a firearm with an obliterated serial number, non-compliance with bond conditions, possession of a destructive weapon, possession of marijuana.

In anticipation of trial, on January 11, 2019, the State produced a transcript of Brian Caldwell's December 2018 interview, subject, however, to a protective order that prohibited Howell's counsel from disclosing Caldwell's identity to anyone, including Howell, without leave of court. This disclosure prompted Howell to request a continuance of the January 23 trial so that his counsel could "investigate sources and resources that could provide impeachment information"[13] on the newly disclosed witness. The Superior Court granted the request and rescheduled Howell's trial for March 12, 2019.

It also came to light in early February that the police had seized Caldwell's phone from which they had extracted data, presumably relevant to Howell's case. According to Howell's counsel, however, the prosecutors assigned to Howell's case told him that "the police were unsuccessful in being able to open, or to complete, the cell phone dump."[14]

---

[13] App. to Answering Br. at B17.
[14] App. to Opening Br. at A22.

Then "sometime within . . . the three weeks"[15] preceding Howell's March 12 trial date, Howell's counsel noticed in a police report that the police had in fact "completed" the download of Caldwell's cell phone—a fact that was apparently unknown by the prosecutors in Howell's case.[16] From the sketchy record, it seems that it was not that the police had not downloaded the contents of Caldwell's phone but that they had done so to a disk that was difficult to open. In any event, after much discussion about how Howell's counsel might gain access to the information on Caldwell's phone, one of the prosecutors produced a flash drive containing Caldwell's cell phone data at 5:30 p.m. on March 11, the day before Howell's trial was scheduled to begin.

According to Howell's counsel, through all of this the prosecutors were "extraordinarily agreeable, going far beyond what [was] required [] in providing discovery and cooperation . . . ."[17] Even so, on the morning of March 12, Howell's counsel advised the court that he needed more time to review the recently provided flash drive, presenting a scheduling request in the alternative: either select the jury that day but defer swearing the jurors and the start of trial until the next day, or continue the trial. The trial judge selected the first of these options, and the jury was selected on the morning of March 12. And based upon its understanding that the

_____

[15] *Id.* at A22.
[16] *Id.*
[17] *Id.* at A18.

trial would begin the following day, the State agreed to lift the protective order that until then had prohibited counsel from disclosing Caldwell's identity to Howell.

On the morning of March 13 and before the jury was sworn, Howell's counsel asked the court to continue the trial for two weeks. The crux of counsel's request was that, having now had the previous afternoon and evening to review the cell phone data, counsel believed that he needed more time to put this newly discovered information to effective use when it came time to cross-examine Caldwell. The State objected, noting that it had provided the disk with Caldwell's cell phone contents on it—albeit a disk that Howell's counsel was unable to open—two months earlier, and counsel neglected to complain about the information's inaccessibility until the week before trial.[18] The State also complained that it would be prejudiced by a continuance because it had agreed to lift the order protecting Caldwell's identity in reliance upon the court's assurance that the trial would only be delayed by one day.

The trial court agreed with the State and denied Howell's request. According to the court, not only had Howell failed to show substantial prejudice, but it had acceded to Howell's request for a one-day delay, which provided an adequate opportunity for Howell's counsel to review the materials in question. The trial judge

---

[18] It is worth noting here that the record seems to indicate that the data was not truly inaccessible but that certain software was required to gain access to it. At oral argument in this Court, Howell's counsel acknowledged that he made no independent effort to extract the data on the disk the State produced to him. Oral Arg. 8:06–8:35, (Sept. 29, 2021).

11

also allowed that, should Caldwell be called by the prosecution that day, the trial would be halted so that Howell's counsel would have another evening to continue his review of the materials. The trial judge also pointed out that the State had agreed to lift the protective order on the premise that the trial would not be subject to further continuances. Hence, the court found that another continuance would be prejudicial to the State.

## F.    Howell's Pretrial Motions

Immediately following jury selection, the trial court addressed three motions and three requested jury instructions Howell had filed that morning. Only one of the motions and one of the requested instructions are implicated in this appeal.

### 1.    Howell's D.R.E. 404(b) Motion

In an application fashioned "Motion for D.R.E. 404(b) Admissibility Hearing," Howell expressed concern about a recorded interview of an unidentified confidential informant by the prosecutor and the chief investigating officer. Because the recording was, according to Howell, "replete with multiple references [to] other bad acts and/or criminal misconduct that represent[] uncharged offenses *vis-á vis* the issues to be presented at trial,"[19] Howell asked the court "to conduct a *voir dire*

---

[19] *State v. Karieem Howell*, ID. 1802010652(N), Docket Item ("D.I.") 47 at 1.

12

hearing to determine the admissibility of offered testimony sought to be introduced via the State's confidential informant. . . ."[20]

When the Superior Court took up the motion after jury selection but before any witnesses were called, Howell's counsel conceded that the court's consideration of the motion was premature and that the court would benefit from hearing from the witnesses other than the informant before conducting the Rule 404(b) analysis. The court agreed and deferred its ruling on the motion.

2.      *Howell's Proposed "Cooperating Witness" Instruction*

Among other instructions that Howell asked the court to give the jury in relation to Caldwell's anticipated testimony, one focused on the jury's consideration of Caldwell's credibility in light of the terms of his cooperation. The instruction read, in full, as follows

INSTRUCTION ON COOPERATING WITNESS TESTIMONY

Ladies and Gentlemen, you are about to hear testimony of a witness who has entered into an agreement with the State to provide testimony, in this trial, and which cooperation may be considered by the State in making a final sentence recommendation to the sentencing judge whenever this witness is sentenced.

The fact that this agreement has been made must not be considered by you as implying that the credibility of this witness is enhanced by it.

---

[20] *Id.*

You will determine the credibility of this witness, as you do all witnesses in this matter, subject to the instructions that I will give you at the conclusion of the trial.[21]

The State did not oppose Howell's request, and the court said that, subject to some "wordsmith[ing],"[22] it would give the instruction.

## G. Howell's Trial

To assess the impact of the trial court's rulings on the fairness of Howell's trial, we cannot view those rulings in isolation. Instead, we must review them in the context of the entire record. And because the rulings with which we are most concerned involve the testimony of Brian Caldwell, we pay special attention to the role that testimony played in the prosecution's case.

Not counting the day when the jury was selected, Howell's trial in the Superior Court lasted four days. In his opening statement, Howell's counsel conceded that the evidence seized at 12 Bradbury and 23 Aldershot indicated that both properties were used by a drug-dealing operation. Speaking of 12 Bradbury, Howell's counsel admitted that "[a]ll that stuff [that] was found in the basement [e.g., digital scale, ammunition, vacuum sealed bags; marijuana remnants]. No doubt about it, it relates to drug distribution."[23] And after running through the items found at 23 Aldershot (cash, marijuana, vacuum bags, weapons), Howell's counsel conceded that they

---

[21] App. to Answering Br. at B21.
[22] Trial Tr. at 56, Mar. 12, 2019.
[23] *Id.* at 36.

pointed to drug dealing.[24]  The trial's focus, then, was not on whether a drug dealing operation was being conducted at 12 Bradbury and 23 Aldershot but, instead, on when that happened, and whether Karieem Howell participated in it.

On the first day of trial, the State called the police officers responsible for the searches at 12 Bradbury and 23 Aldershot and at Brian Caldwell's residence. Detective McAndrew first described the various items seized at 12 Bradbury and, as noted before, opined that what he saw in the basement "appeared to be a drug packaging and resale location. . . ."[25]  But he also offered testimony linking Howell to 12 Bradbury beyond the letters spelling Howell's nickname—R-E-E-M—posted on the basement wall.  Detective McAndrew also explained how he had recovered and photographed an electric bill for 12 Bradbury Road in Karieem Howell's name. Moreover, during pre-search surveillance of 12 Bradbury, the police noted that Howell had visited this residence "at least twice."[26]

Detective McAndrew also served as the testimonial conduit for certain text messages the police recovered after seizing Malique's cellphone during the search of 23 Aldershot.  The messages take the form of text "conversations" between Howell and his brother Malique.  Although the language Howell and Malique used was, for the most part, cryptic, one exchange on January 31—within the indictment

---

[24] *Id*. at 40 ("Drug dealing.  Okay.  Let's concede that.").
[25] *Id*. at 60.
[26] *Id.* at 104.

date-range of January 17 to February 16—is relevant to the parties' respective theories of the case:

Karieem Howell:   1550 a jawn Ard.
                  Jeremy Lin bag should have 26 jeans in it.
                  Nasty and duly should have 37.[27]

Malique Howell:   Crown roil

Karieem Howell:   Yea just take the folded stacks outta there.

                  Call me after it's all counted and Jeremy Lin is in
                  one bag and nasty is in the other and lmk what's
                  left.[28]

Based on his experience, Detective McAndrew testified—without objection—that "[i]n this context [jawn is] referring to drugs[] [though] sometimes it refers to firearms."[29] The detective also inferred that "['']jeans['] was an auto-correct." He observed further that "$1,550 is consistent with a pound of marijuana." Thus, crediting Detective McAndrew's interpretation, one might conclude that this exchange describes an anticipated sale of 26 pounds for $37,000, or slightly more than $1,400 pound.

---

[27] It was later revealed that "Nasty" and "Duly," whose name is Abdula, were two of Howell's customers.

[28] State's Ex. 26.

[29] Trial Tr. at 85, Mar. 13, 2019. "Jawn" is a catchall that has been described as "the Philadelphia all-purpose noun." Merriam Webster, *Some Jawn About Jawn*, https://www.merriam-webster.com/words-at-play/jawn-meaning-origin (Last Accessed: Dec. 10, 2021). Although not included in traditional dictionaries, "jawn" has been defined as "an all encompassing substitute for any person, place, or thing" and as "Philadelphia slang for anything . . . literally anything." Dictionary.com, *What Does Jawn Mean,* https://www.dictionary.com/e/slang/jawn/ (Last Accessed: Dec. 10, 2021).

Next Detective Michael Macauley testified about the execution of the search warrant at 23 Aldershot, a split-level home approximately 50 yards from an elementary school where, at the time, Howell and Malique were living. Detective Macauley described the items seized inside the residence as well as behind the shed in the backyard. All told, the police seized approximately 110 grams (a little under four ounces)[30] of marijuana, over $26,000 in United States currency, numerous types of ammunition, four long guns, and a handgun with an obliterated serial number. Howell was not present when 23 Aldershot was searched, but Malique and Harrison Dorsey were, and both were arrested.

The first day of trial testimony was rounded out by the testimony of Detective Bradley Landis, who told the jury about his receipt of information from a confidential source in early 2018 that Brian Caldwell was selling large amounts of marijuana from his residence in Bear, Delaware. That tip led to a search of that residence where, as mentioned, the police recovered three-quarters of a pound of marijuana, $11,400 in cash, used plastic vacuum-sealer bags with markings similar to those on the bags found at 12 Bradbury, and Caldwell's cell phone. That seizure led to Caldwell's arrest and confession and eventually to his agreement to cooperate with the State and testify against Howell. Caldwell's testimony would come the following day, but not until the jury first heard from Howell's brother, Malique.

---

[30] State's Ex. 32.

17

Malique took the stand to begin the second day of trial testimony. During direct examination, the prosecutor asked Malique to read various text messages—an exercise of only marginal utility given the cryptic nature of the messages and Malique's general unhelpfulness in translating them. For example, when asked what the elusive "jawn" meant in the context of the exchange quoted above—the one about which Detective McAndrew said that "jawn" meant "drugs" and that "jeans" was an auto-correct—Malique responded that he did not know. By contrast, however, what the word "jeans" meant in the same exchange, was clear to Malique: "things that people wear,"[31] that is, clothing made of denim. And so Malique then translated the ensuing references to "stacks," not to stacks of money but stacks of clothes. Thus, for Detective McAndrew, this brief text exchange described an anticipated sale of marijuana at the price of $1,550 per pound, while for Malique it had something to do with blue jeans.

The prosecution concluded its direct examination by playing two video-recorded police interviews of Malique, both conducted on the day of his arrest, February 16, 2018, following the search of 23 Aldershot. In the first interview, Malique admitted to ownership of the Taurus handgun with the obliterated serial number, knowledge of two of the long guns found near the shed, and regular

---

[31] Trial Tr. at 24, Mar. 14, 2019.

consumption of marijuana.  But he denied any wrongdoing beyond that.  In the second interview, Malique said nothing that would incriminate his brother.

Up to this point in the trial, the prosecution had introduced ample evidence on the issue Howell had conceded in his opening statement—that someone was dealing drugs from 12 Bradbury and 23 Aldershot.  But there was scant evidence, save the scarcely intelligible text communications, of the identity of the drug enterprise's participants and the timing of the enterprise's activities.  Enter Brian Caldwell.

The prosecution wasted no time on its way to the heart of the matter, as evidenced by the following exchange within minutes of Caldwell's taking of the witness's oath:

Q. Mr. Caldwell, do you understand why you are here today?
A. Yes, sir.

Q. Were you arrested on or about February 22nd of 2018?
A. Yes, sir.

Q. What were you charged with?
A. Possession of a firearm and selling marijuana.

Q. You were charged with drug dealing?
A. Yes.

Q. When you [were] arrested on February 22, 2018, did you consider yourself to be a drug dealer?
A. Yes.

Q. What were you selling?
A. Marijuana.

> Q.    Where were you getting that marijuana from that you were selling?
>
> A.    Karieem Howell.[32]

The prosecutors then turned to Caldwell's cooperation agreement with the State.   Recall here that, two days before, the court had agreed to give a "wordsmithed" version of Howell's requested instruction, which advised the jury that Caldwell's cooperation did not "imply[]" that his credibility was "enhanced."[33] But after the cooperation agreement was marked as an exhibit, the trial judge turned to the jury and instructed them:

> Ladies and gentlemen, you are about to hear testimony of a witness who has entered into an agreement with the State to provide testimony in this trial.  The agreement provides something to the effect that the State will consider the witness' cooperation when the State makes a final sentencing recommendation to the judge who will ultimately sentence this witness. *You may not consider this agreement in weighing the witness' credibility.*[34]

Apparently, and regrettably,[35] no one noticed the substantive change in the requested instruction, and, hence, no one objected.

When Caldwell's testimony resumed, he explained that a couple months earlier—around the time Malique Howell, Sharon Howell, and Harrison Dorsey resolved their cases by way of plea agreements—he too had entered into a plea

---

[32] App. to Answering Br. at B100.

[33] *See infra* notes 18 and 19.

[34] App. to Answering Br. at B101 (emphasis added).

[35] We are confident that, had a timely objection been made, the trial judge would have clarified this instruction.

agreement with the State. Under his agreement, Caldwell had pleaded guilty to Tier I possession of marijuana, a Class F felony, and agreed to forfeiture of $11,400 and the firearm seized from his house. Following this explanation, Caldwell made an in-court identification of Howell.

These formalities out of the way, the prosecutor's questioning of Caldwell returned to the subject of his dealings with Howell. As of the date of his arrest in February of 2018, Caldwell had been a purveyor of marijuana for approximately two years. During that time, Caldwell would purchase his marijuana—typically "[a] couple pounds"[36]—from Howell "[o]nce every week or two."[37] These transactions occurred at both the Bradbury and Aldershot addresses, but primarily at 12 Bradbury. Occasionally, Howell's mother would be involved, but Caldwell "usually got the weed from [Howell]."[38]

According to Caldwell, he had obtained the marijuana for which he was arrested on February 22, 2018, from Howell the night before the police raided the Bradbury and Aldershot houses. On that evening, Howell, who had business elsewhere, told Caldwell to pick up the marijuana on his own at the Bradbury residence. Caldwell then texted Sharon, who was at the residence, to alert her of his anticipated arrival time. During their investigation, the police retrieved this text

---

[36] App. to Answering Br. at B109.
[37] *Id.* at B126.
[38] *Id*. at B109.

21

message exchange between Caldwell and Sharon Howell, which Caldwell read in the presence of the jury. Upon his arrival, Caldwell went to the basement and into a closet and helped himself to the agreed upon amount of marijuana. Though this "self-service" might seem unusual, it was not without precedent—Caldwell had done the same once before.

The prosecution then turned its attention, over Howell's objection under D.R.E. 404(b), to the longevity of Caldwell's business relationship with Howell, as evidenced by text exchanges between them. Two text messages, read by Caldwell for the jury's benefit, are illustrative of the others. On October 22, 2016, Howell texted Caldwell: "Well what's up I pay him for the plug go drive and do it and sell him jawns 2900 all day not threw the mail and I'll do 3000 for you what's up."[39] And on November 26: "Ard give me the 3000 next Tim if the cash isn't there for 3 it's not 3100 Idc if I gotta come back, Ard."[40] Caldwell explained that these messages were discussing how much he was paying for a pound of marijuana.

The prosecution also deployed Caldwell to plug another critical hole in its case—the weight of the marijuana. Keep in mind that the police recovered 110 grams or slightly less than four ounces of marijuana at 23 Aldershot and a negligible amount at 12 Bradbury. But to make its case on the charge of drug dealing under

---

[39] *Id*. at B120; State's Ex. 51 at 12.
[40] *Id*. at B120, State's Ex. 51 at 6. Caldwell translated "Ard" to mean "alrighty." B119.

Count X[41] of the indictment, the State had to prove that Howell possessed with the intent to deliver 4,000 grams or 8.8 pounds or more of marijuana. Once again, Caldwell filled the gap.

On this topic, Caldwell testified that Howell had confided in him that two of his other customers—individuals named "Nasty" and Abdula—would buy "[a]nywhere from 15, 20, 25 pounds"[42] of marijuana from Howell. The record is not clear as to when these transactions took place. But Caldwell also testified that he had seen as much as 140 pounds at Howell's residence, and this time the testimony was tethered to early February 2018, squarely within the indictment's date range.[43]

Caldwell was also an essential witness on the obliterated-serial number charge. That morning, the jury had watched and listened to the two recorded interviews of Malique Howell. And during the first of those interviews, Malique admitted that the gun with the obliterated serial number seized at 23 Aldershot belonged to him. That, of course, did not preclude a finding that Howell also

---

[41] Throughout this opinion, the indictment's counts are numbered in accordance with the re-indictment filed on January 7, 2019, which was the operative indictment as the trial began. Because the trial court granted Howell's motion for judgment of acquittal as to Counts I-IV and the State entered *nolle prosequis* as to certain other counts, the court renumbered the counts in its jury instructions following the reception of evidence and counsel's closing arguments.

[42] App. to Answering Br. at B129.

[43] To be sure, there are ambiguities surrounding when Caldwell claimed to have seen the 140 pounds. On the one hand, a question posed by Howell's counsel and Caldwell's responses seem to peg the date to the night before Howell's house was raided by the police. *See* App. to Answering Br. at B166–67. On the other hand, Caldwell testified that he saw the 140 pounds at a time when Howell was home, which is inconsistent with his earlier testimony that he had to retrieve the marijuana himself that night because Howell was *not* home. *See supra* pp. 21–22.

possessed the gun; in fact, the indictment charged that both Howell and Malique possessed it. Caldwell lent credence to this allegation when he testified that Howell had asked him—it is not clear when—if he was interested in buying a "dirty weapon."[44] Caldwell understood a "dirty weapon" to be a gun without a serial number.[45]

On cross-examination, Caldwell acknowledged that, in June 2018 when he agreed to cooperate with the police, he was "pissed off"[46] at Howell. This anger was a product of Caldwell's belief that Howell somehow set him up to be arrested back in February. In consequence, Caldwell provided another statement to the police implicating Howell. Eventually, Caldwell's cooperation was memorialized in a written cooperation agreement.

Under the agreement, Caldwell agreed to "cooperate fully with [the Delaware Department of Justice], specifically with regard to the matter of State of Delaware v. Karieem Howell (Case ID #1902010652), Malique Howell (Case ID # 1802010526), and Sharon Howell (Case ID #1802010507)."[47] The scope of Caldwell's agreement to cooperate included confirmation that his June 2018 statement to the police was accurate and a commitment to testify at Howell's trial.

---

[44] App. to Answering Br. at B129.
[45] *Id.*
[46] *Id.* at 146.
[47] *See* D.I. 47 (stipulation) and D.I. 48 (cooperation agreement).

24

The agreement was explicitly linked to Caldwell's plea agreement, under which a weapons charge carrying a minimum-mandatory prison sentence was dropped and the severity of Caldwell's drug charge was reduced. In addition to those benefits, the State agreed to recommend a prison sentence, suspended though for probation. But should Caldwell withdraw from or violate any provision of the agreement, the State would be released from its obligations under the cooperation and plea agreement, including the sentencing recommendation. To ensure Caldwell's compliance, his sentencing was deferred until after Howell's trial.

On the third and final day of trial testimony, Detective McAndrew was recalled to the stand but his testimony was uneventful, at least as it relates to the issues raised on appeal.

The State's last witness in its case-in-chief was Detective Trevor Riccobon of the New Castle County Police Department. Under a stipulation of the parties, the court admitted Detective Riccobon's testimony as expert testimony.[48] The prosecutor asked the detective to comment on various items of evidence and whether that evidence was consistent with possession of marijuana for personal consumption or, instead, was indicative of a drug-dealing operation. Among the evidence

---

[48] The precise scope of Detective Riccobon's expertise was never delineated. But when the prosecutor, near the conclusion of his direct examination, asked the court to accept the detective's testimony as expert testimony, Howell's counsel "agree[d] that he's expert in . . . the drug areas he's spoken about." Trial Tr. at 88, Mar. 15, 2019.

Detective Riccobon considered were:  the absence of personal-use paraphernalia, such as rolling papers, pipes and bongs; the text messages, the subject matter of which he concluded were transactions involving multiple pounds of marijuana; the number and size of vacuum seal bags found at 12 Bradbury; and the large amount of cash found during the two searches.  From all this, Detective Riccobon opined that the police had uncovered something "beyond [the] personal use of marijuana.  This [was] drug dealing."[49]

After the prosecution rested, Howell moved for judgment of acquittal on Counts I through IV of the indictment (the PFDCF counts related to guns found near the shed at 23 Aldershot) and Count IX (the obliterated-serial-number charge).  The court granted the motion as to Counts I through IV, noting that possession for purposes of a PFDCF charge includes accessibility and "that the guns that were behind the shed were [not] sufficiently close to either the house or the drugs to satisfy the accessibility requirement."  But, the court observed, the possession element under the obliterated-serial number count was much broader than under the PFDCF statute and includes constructive possession and joint possession with another person.  There was evidence that Howell and his brother Malique were engaged in drug dealing at 23 Aldershot and that the gun in question was found in the same general area as drug dealing paraphernalia.  On top of that, there was evidence that

---

[49] *Id*. at 92.

Howell offered to sell Caldwell a firearm with an obliterated serial number. Hence, the court concluded that there was sufficient evidence from which the jury could conclude that Howell had joint constructive possession with his brother of the firearm with the obliterated serial number. Accordingly, the court denied the motion as to Count 9.

At the outset of the defendant's case, Howell recalled and briefly questioned Detectives Landis and McAndrew. Detective Landis's testimony was uneventful. Detective McAndrew confirmed that Malique Howell's fingerprints—and not Howell's—were on the digital scale and box found at 23 Aldershot.

The defense then called Loretta McCleary, Sharon's sister and thus Howell's aunt. Ms. McCleary resided at 12 Bradbury since March of 2015. At that time, Howell and Malique lived there too, Howell occupying the bedroom in the basement and Malique the room next to Sharon's upstairs. McLeary's testimony concerning who occupied the bedroom in the basement was confusing. She first testified that she was "staying"[50] in the basement from the summer of 2017 onward. She later testified that she moved into the basement in January of 2018. She did state, however, that Howell and his brother moved out of 12 Bradbury in November 2017. Immediately before the move, according to McCleary, Malique occupied the basement bedroom. Finally, McCleary acknowledged that she was living in the

---

[50] *Id.* at 148.

basement bedroom in February 2018 when the police executed the search warrant at 12 Bradbury, but disclaimed all knowledge of the vacuum seal bags and digital scale, which were ten feet from her bedroom.

Having been advised of his right not to testify, Howell nevertheless took the stand in his own defense. Although Howell's direct examination was lengthy—according to the time stamps on the trial transcript it was approximately two hours and forty minutes long—the preponderance of it did not respond directly to the evidence admitted during the State's case-in-chief. For instance, the first hour and ten minutes consisted of Howell's description of his pit bull-breeding business and related activities. From there, he proceeded to describe his role as an entertainment and night-club promoter with a sideline interest in plugging men's clothing. To be sure, this background provided the foundation for Howell's explanation of portions of the State's evidence (e.g., the presence of large amounts of U.S. currency and the meaning of the cryptic text messages), but it did little to rebut Brian Caldwell's testimony.

That said, for all its digressions, Howell's testimony attempted to explain away some of the evidence that the State claimed was incriminating. On the text-message front, for example, he explained that his reference to "jeans" in the January 31 text message was to just that—blue jeans—which he was plugging for a friend who was trying to start a clothing line. And a text message—"I need eight"—that

Detective Riccobon translated as a request for one-eighth of an ounce,[51] according to Howell, was actually referring to eight dog vaccination shots. Likewise, he said that his veterinarian, who lived in a game-rich area of Pennsylvania, had the guns he needed to hunt but not the ammunition. Presumably, the veterinarian's request that Howell bring him the required ammunition explained the presence of ammunition at the two houses with which Howell was associated.

More to the point of the prosecution, however, Howell admitted that he was a drug dealer in 2016 and 2017, selling marijuana by the pound. That ended though in December of 2017—one month before Count X's drug-dealing date range—when he "got out of the game."[52] In that regard, Howell's denial of drug dealing did not address the January 17-February 16, 2018 date range and was limited to a single date—February 16, 2018.[53]

Finally, Howell said that he did not know why his mother and brother, with whom he claimed to be close, had pleaded guilty to drug dealing. Nor did he refute Caldwell's testimony that he had sold marijuana to Caldwell in February 2018 and

---

[51] We note that Riccobon's interpretation, found at page 64 of the March 15, 2019 trial transcript, is puzzling in that this quantity is starkly out of line with the much larger quantities referred to in the indictment and throughout Howell's trial.

[52] Trial Tr. at 238, Mar. 15, 2019.

[53] *Id.*

> Q. How about, your [sic] charged on February 16 with drug dealing—
> A. No I was staying . . .
> Q ...2018?
> A. No, I was staying to myself.

had told Caldwell that he sold marijuana to "Nasty" and "Duly" in large quantities—15 to 25 pounds.

At the conclusion of Howell's testimony, the defense rested.

The parties' closing arguments ran along predictable lines. The prosecution drew attention to Howell's admission that he had been a drug dealer, the guilty pleas of his family members, the evidence seized during the two residential searches, and the cryptic text messages that, according to the State's law-enforcement witnesses, were indicative of illicit drug transactions. But what in our eyes is most relevant to the resolution of Howell's appeal is the extent to which the prosecution emphasized that its most essential allegations were supported by Brian Caldwell's testimony

By our count, in the approximately 40 pages of the transcription of the prosecutor's opening closing argument, Caldwell is mentioned by name 26 times on 12 of those pages. And these references were not in passing; they went directly to the heart of the prosecution's case, describing Caldwell's recent purchase of marijuana from Howell—with his mother's assistance—from the residence at 12 Bradbury; Howell's longstanding status as Caldwell's marijuana supplier; Caldwell's first-hand knowledge of Howell's storage and delivery of large amounts of marijuana; and Howell's offer to sell Caldwell a firearm with an obliterated serial number.

Not surprisingly, in his closing argument, Howell acknowledged the centrality of Caldwell's testimony to the prosecution. For instance, on whether Howell possessed marijuana at 12 Bradbury *with the intent to deliver it*, Howell's counsel argued that "[the jury didn't] have any evidence of that except Brian Caldwell. . . ."[54] In like manner, when addressing the thinness of the proof of Howell's possession of 4,000 grams of marijuana—an element of drug dealing under Count X—Howell's counsel "assumed they are relying upon none other than Brian Caldwell, the ever trustworthy Brian Caldwell. . . ."[55] And this refrain was repeated when Howell's counsel addressed the State's proof of the obliterated-serial-number charge: "[T]here is not an ounce of proof except Brian Caldwell says . . . once upon a time, we don't know when . . . . [T]hey're going to say because Brian Caldwell said he was offered one once and you can believe it happened if Brian Caldwell said so."[56]

Following that, the prosecution doubled down on its reliance on Caldwell in its rebuttal closing, devoting more than half of its rebuttal argument to Caldwell's testimony. In sum, if there was a witness who commanded the attention of counsel—and presumably the jury—during closing arguments, it was not any of the investigating officers, it was not Howell's brother, and it was not Howell himself; it was unquestionably Brian Caldwell.

---

[54] Trial Tr. at 71, Mar. 18, 2019.
[55] *Id*. at 72.
[56] *Id.* at 77.

31

## H.    The Jury's Verdict and the Court's Sentence

Because the State entered *nolle prosequis* on the four possession-of-a-firearm-by-a-person prohibited charges and, as mentioned, the court had entered judgment of acquittal as to four of the PFDCF charges at the conclusion of the prosecution's case-in-chief, the jury retired to deliberate on six counts: two counts of drug dealing (one for possessing with intent to deliver marijuana within a protected school zone and the other for delivering or possession with intent to deliver 4,000 grams or more of marijuana) and single counts of PFDCF, conspiracy in the second degree, possession of a weapon with an obliterated serial number, and possession of drug paraphernalia. The jury found Howell guilty of all but the PFDCF charge. After considering and denying a post-verdict motion for judgment of acquittal over the course of the next six months, the court sentenced Howell to 30 years of Level V incarceration, suspended after five years for decreasing levels of supervision, and Howell appealed.

## I.    Howell's Claims on Appeal

Howell raises eight claims on appeal. First, he contends that the trial court abused its discretion when it denied his continuance request on the day after the jury was selected abut before it had been sworn. Second, Howell claims that, because the courtroom was configured in a way that partially obstructed his view of the jury,

"his constitutional rights to due process and/or right of presence during trial"[57] were violated. Howell's third argument is that the trial court's "cooperating witness" instruction misstated the law and meets the plain-error standard. Fourth, Howell asserts that the trial court abused its discretion when it allowed the State to introduce text messages containing evidence of prior uncharged misconduct in violation of D.R.E. 404(b). Fifth, Howell argues that the trial court's instruction relating to the possession-of-a weapon-with-an-obliterated-serial-number charge was so flawed as to constitute plain error. Howell's sixth and seventh arguments challenge the sufficiency of the evidence as to the obliterated-serial-number count and the weight of marijuana necessary to support one of the drug dealing counts. Finally, and for good measure, Howell raises a "cumulative error" claim.

## II. ANALYSIS

Our analysis of Howell's arguments, to the extent necessary, proceeds in the order of their importance to our resolution of his appeal. Because we reverse and remand for a new trial, consideration of Howell's claim that the Superior Court's denial of his continuance request was reversible error is unnecessary. And given our reversal and our rejection of all but one of Howell's appellate claims, neither must we consider his "cumulative error." Yet because the resolution of the remaining

---

[57] Opening Br. at 13.

33

argument will affect the scope and conduct of Howell's new trial—should there be one—we address them in turn.

## A. The trial court's "cooperating witness" instruction was plainly erroneous

Howell contends that the trial court erred when it instructed the jury, during Brian Caldwell's testimony, that it should not consider Caldwell's cooperation agreement with the State in weighing his credibility. He acknowledges that, because he did not object to the instruction, this misstep is subject to review under our plain-error standard. The State concedes that the instruction was erroneous, but argues that, because the evidence against Howell independent of Caldwell's testimony, was strong and the court provided a correct—though general—witness-credibility instruction before the jury deliberated, the error was not plain.

The parties are correct that an unpreserved claim that a jury instruction was erroneous is subject to plain-error review. Not only must Howell show that the instruction contained an incorrect statement of the law,[58] he must also demonstrate, that the error was "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial."[59]

---

[58] *See White v. State*, 243 A.3d 381, 405 (Del. 2020) (quoting *Miller v. State*, 224 A. 2d 592, 596 (Del. 1966)).

[59] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) (citing *Dutton v. State*, 452 A.2d 127, 146 (Del. 1982)).

The State rightly concedes that Howell has cleared the first hurdle of this test. The court's "cooperating witness" instruction was not a correct statement concerning the potential relevance of the witness's cooperation to the jury's assessment of Caldwell's credibility.

In *Wright v. State*,[60] this Court recognized that a jury may consider a witness's cooperation with law enforcement and "his repeated willingness to testify in order to advance his own legal interests" when weighing the credibility of the witness's testimony.[61] What is more, we characterized a witness's prior agreement to cooperate with the prosecution as "useful impeachment evidence for [the defendant] at his trial."[62] Although *Wright* was decided in the context of a claim that the prosecution had violated its disclosure obligations under *Brady v. Maryland*,[63] the notion that a witness's cooperation is relevant to the jury's credibility assessment is equally applicable here. And *Wright* is but one in a long line of cases in which we have recognized that deals made between the prosecution and a witness are relevant—and can be damaging—to the witness's credibility.[64]

---

[60] *Wright v. State*, 91 A. 3d 972, 989 (Del. 2014).
[61] *Id.*
[62] *Id.*
[63] *Brady v. Maryland*, 373 U.S. 83 (1963). A *Brady* violation occurs when the state suppresses evidence that is favorable—that is, exculpatory or impeaching—to the accused, causing prejudice to the defendant.
[64] *See, e.g., VanArsdall v. State*, 542 A.2d 3, 11–12 (Del. 1987) (denial of cross-examination about prosecutor's offer of a "deal" to witness in order to secure witness's cooperation and testimony was reversible error because, without it, "there was a greater probability that the jury believed [the

This is so much the case that federal courts are known to instruct juries to apply a healthy dose of skepticism to the testimony of cooperating witnesses. The Third Circuit Court of Appeals, for instance, has published a model criminal instruction that touches upon this issue:

> **4.20  Credibility of Witnesses – Testimony of Informer**
>
> **You have heard evidence that** *(name of witness)* **has an arrangement with the government under which** *(he) (she) (gets paid) (receives) (describe benefit)* **for providing information to the government.** *(Name of witness)***'s testimony was received in evidence and may be considered by you. The government is permitted to present the testimony of someone who** *(gets paid) (receives) (describe benefit)* **for providing information to the government, but you should consider the testimony of** *(names of witness)* **with great care and caution. In evaluating** *(name of witness)***'s testimony, you should consider this factor along with the others I have called to your attention. You may give the testimony such weight as you think it deserves. It is for you to determine whether or not** *(name of witness)***'s information**

---

witness]." Additionally, revelation to jury that prosecutor made deal with witness "also may have affected the jury's view of the strength of the prosecution's case as a whole."); *see also Johnson v. State*, 129 A.3d 882, 2015 WL 852889, at *1 (Del. Dec. 10, 2015) (TABLE) (noting that trial counsel whose performance was challenged as ineffective, "adequately impeached [the witness] on the plea agreement, which served to undermine [the witness's] credibility. . . .); *Downes v. State* 676 A.2d 902, 1996 WL 145836, at *3 (Del. Mar. 13, 1996) (TABLE) (contrary to defendant's argument that submission of plea agreement and joint indictment to jury impermissibly bolstered witness's credibility, "[i]f anything, the presentation of these documents served to impeach [the witness's credibility in the eyes of the jury, not bolster it.") *Allen v. State*, 878 A.2d 447, 451 (Del. 2005) (admission of co-defendant's plea agreement into evidence is for the limited purpose of allowing the jury to accurately assess co-defendant's credibility as witness); *and see Phillips v. State*, 154 A.3d 1146, 1165 (Del. 2017) (jury "could and should take into consideration" witness's plea agreement that contained certain benefits when determining the credibility of witness's testimony).

**or testimony may have been influenced by** *(his) (her)* **arrangement with the government.**[65]

Likewise, the United States Supreme Court, in *Hoffa v. United States*,[66] relied in part on a similar instruction when it rejected the defendant's claim that the government's use of the testimony of an informer, whose charges were dropped and whose wife received four monthly installment payments of $300, violated the defendant's due process rights. The Supreme Court noted the following jury instruction with approval:

> You should carefully scrutinize the testimony given and the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether the witness is worthy of belief. Consider each witness' intelligence, his motives, state of mind, his demeanor and manner while on the witness stand. Consider also any relation each witness may bear to either side of the case . . . . All evidence of a witness whose self-interest is shown from either benefits received, detriments suffered, threats or promises made, or any attitude of the witness which might tend to prompt testimony either favorable or unfavorable to the accused should be considered with caution and weighed with care.[67]

In this case, Howell did not request such a defense-friendly instruction; instead, he merely asked the court to instruct the jury that Caldwell's cooperation does not necessarily *enhance* his credibility. But, as given, the court's instruction

---

[65] Third Cir. Comm. on Model Crim. Jury Instructions, *Final Instructions: Consideration of Particular Kinds of Evidence*, Third Circuit Court of Appeals § 4.20 (2021), https://www.ca3.uscourts.gov/model-criminal-jury-table-contents-and-instructions. (Bold and italics in original).

[66] *Hoffa v. United States*, 385 U.S. 293 (1966).

[67] *Id*. at 312 n.14. By quoting this instruction and the Third Circuit's model instruction, we do not comment on their propriety.

effectively removed Caldwell's status as a cooperating witness who had a selfish reason for testifying in a manner favorable to the prosecution from the jury's assessment of his credibility altogether. And that was error.

We turn next to whether this error undermined the integrity and fairness of Howell's trial. The State says that it did not because, among other things, Howell was "given broad latitude to probe Caldwell's credibility"[68] by cross-examining him about his prior truthfulness, his favorable plea, and his agreement with the State. The State suggests, moreover, that Howell was permitted to argue to the jury in closing that Caldwell's sentencing fate—still pending when he testified—hinged on whether his testimony was satisfactory to the prosecution. All this is true, but it misses the point. It does not address the trial court's instruction, which prohibited the jury from considering these very facts "in weighing [Caldwell's] credibility."[69]

Next, the State maintains that the erroneous instruction should not undermine our confidence in the result of Howell's trial because the evidence against Howell that was not dependent on Caldwell's testimony was strong. According to the State, "[b]ecause Howell cannot establish that the result would have been different absent the error, he is therefore not entitled to reversal."[70] To begin with, this misstates Howell's appellate burden. The State offers no authority—and we are aware of

---

[68] Answering Br. at 26.
[69] *Id.* at 25.
[70] *Id.* at 27.

none—that requires a litigant claiming plain error to show that, but for the error, the outcome of the trial would be different.[71]

But what is more to the point, the State's claim that overwhelming independent evidence pointed to Howell's guilt cannot be squared with the record. To be sure, the State presented a mountain of evidence from which the jury could conclude beyond a reasonable doubt that someone associated with 12 Bradbury and 23 Aldershot was dealing drugs. Yet the same cannot be said of certain key elements of the offenses with which Howell was charged.

First and foremost among those elements was the identity of the drug dealer. It is undisputed that others, including two of Howell's pleading codefendants—his mother Sharon and brother Malique, neither of whom incriminated Howell— had unfettered access to the areas in the two residences where the drugs, weapons, cash, and other paraphernalia were found. And though the State might have argued that the obscurely worded text messages were suggestive of drug activity on Howell's part, doubt lurked around the question of Howell's involvement in the operation the police uncovered. If credited, Caldwell's testimony removed that doubt. Not only did Caldwell describe Howell's ongoing involvement in the drug-dealing operation,

---

[71] In its answering brief, the States cites two cases in apparent support of its suggestion that Howell's inability to show that the result would have been different had not the erroneous instruction been given precludes a finding of plain error, *Fink v. State*, 817 A.2d 781 (Del. 2003) and *Allen v. State*, 1990 WL 254350 (Del. Dec. 14, 1990). Although both of these cases deal with the absence of plain error because of overwhelming evidence of guilt, neither supports the application or adoption of the test the State has articulated.

but he also testified that Howell was involved in a recent delivery of marijuana to him within the indictment's date range—evidence otherwise missing from the State's case-in-chief.

Next there is the matter of the weight—4,000 grams (or 8.8 pounds) of marijuana—Howell's delivery or possession of which the State was required to prove under Count X of the indictment. Without Caldwell's testimony, the State would have been reduced to asking the jury to infer that, because Howell possessed vacuum-sealer bags *capable* of containing 4,000 grams of marijuana and an amount of cash greater than the value of 4,000 grams, he must have possessed that amount of marijuana at one time during the date range charged in the indictment. Not impossible, but hardly ideal.

And finally, Caldwell provided a critical piece of evidence on the charge that Howell possessed a weapon with an obliterated serial number. In light of Malique Howell's admission that the gun with the obliterated serial number belonged to him, evidence, beyond its location in 23 Aldershot, linking Howell to that gun was critical to the State's allegation that Malique possessed the gun jointly with Howell. And once again, Caldwell's testimony provided the missing link.

In light of Caldwell's central role in the prosecution's case-in-chief as to these key issues, we reject the State's claim that the other evidence of Howell's guilt was

so overwhelming that we should overlook the Superior Court's undue restriction on the jury's consideration of Caldwell's credibility.

Finally, the State contends that the erroneous "cooperating witness" instruction does not amount to plain error when it is considered together with the instructions the trial court read to the jury before its deliberations. Specifically, the court told the jury:

> You are the sole judges of the credibility of each witness. You decide the weight to be given to each witness's testimony. You should consider each witness's means of knowledge, strength of memory, and opportunity for observation, the reasonableness or unreasonableness of the testimony, the consistency or inconsistency of the testimony, the witness's motivations, whether the testimony has been contradicted, the witness's bias, prejudice or interest, if any, the witness's manner or demeanor upon the witness stand, and all other facts and circumstances shown by the evidence that affect the credibility of the testimony.[72]

No doubt, there are circumstances where a minor flaw in a jury instruction that is not objected to in the trial court will not rise to the level of plain error, when the instructions viewed in their entirety contain an accurate statement of the law.[73] But the general rule is that "a jury should not have to reconcile two contrary statements of the law."[74] And that is precisely what the jury was asked to do as it considered the credibility of an important prosecution witness. As a general matter, the jurors were told that they were the sole judges of the credibility of the witness

---

[72] App. to Answering Br. at B260–61.
[73] *See Sheehan v. Oblates of St. Francis de Sales*, 15 A 3d. 1247, 1255–56 (Del. 2011).
[74] *Id*. at 1256.

and, as such, were entitled to take into account "all facts and circumstances shown by the evidence that affect the credibility of the testimony."[75] And one such fact or circumstance would be "the witness's motivations."[76] But when Caldwell was sitting before the jury, the court specifically instructed the jurors to the contrary, warning them that they were not to consider a very relevant circumstance—Caldwell's cooperation agreement—and how that might affect his credibility.

It is unreasonable, in our view, to expect a jury to reconcile these two instructions or to determine which of the two is correct and which is erroneous. We are not satisfied that the jury felt free to disregard the trial court's specific instruction concerning its determination of Caldwell's credibility in favor of the more general instruction regarding witness credibility. And, given Caldwell's role in this case, this compromised the fairness of Howell's trial and necessitates a new trial.

## B. Howell's challenges to the sufficiency of the evidence are without merit

Howell contends that the evidence introduced at trial was insufficient to establish the elements of possession of a weapon with an obliterated serial number and the weight element (4,000 grams or more of marijuana) of the drug dealing offense charged in Count III of the indictment. In other words, Howell claims that the Superior Court erred when it denied his motion for judgment of acquittal as to

---

[75] App. to Answering Br. at B260–61.
[76] *Id*. at 260.

these two alleged offenses. Despite our reversal on other grounds, we must yet address this claim because of double-jeopardy considerations.[77]

We review the Superior Court's denial of a motion for judgment of acquittal *de novo* to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements, beyond a reasonable doubt.[78] When we conduct this inquiry, we do not distinguish between direct and circumstantial evidence.[79]

1.    *The obliterated-serial-number charge*

The Superior Court neatly summarized the evidence supporting the jury's verdict on the obliterated-serial number count:

> The firearm in question was found in the basement living area of Howell's residence. Although Malique and Howell testified that area exclusively was Malique's, the jury was free to weigh their credibility and their motivations for that testimony. Even if the jury accepted that testimony, other evidence the State presented was sufficient to support the jury's conclusion that Howell constructively possessed the firearm and was aware that the serial number was removed or obliterated. Howell's backpack contained 9 millimeter ammunition, which was the same caliber as the firearm at issue. No other 9 millimeter firearm was found in the residence. The obliteration of the serial number on the firearm was visible to the naked eye. Finally, Caldwell testified that Howell previously offered to sell him a "dirty" weapon, which Caldwell explained was a firearm without a serial number. That evidence and

---

[77]*United States v. Scott*, 437 U.S. 82, 90–91 (1978) ("The successful appeal of a judgment of conviction, on any ground other than the insufficiency of the evidence to support the verdict, poses no bar to further prosecution on the same charge.") (internal citation omitted); *Danks v. State*, 229 A.2d 789, 792 (Del. 1967) (allowing retrial where reversal was "not . . . based on lack of evidence, but . . . based upon error of law[.]")).

[78] *Cushner v. State*, 214 A.3d 443, 446 (Del. 2019).

[79] *Robinson v. State*, 953 A.2d 169, 173 (Del. 2008).

testimony was enough to allow the jury to find Howell guilty of Count V.[80]

Howell asserts—in a conclusory fashion—that, because Malique Howell admitted that he had purchased the gun in question and Caldwell did not identify the date of Howell's offer to sell the "dirty weapon," no rational jury could conclude that the gun offered for sale was the gun found in the basement of Howell's primary residence. We disagree. The jury was not bound to accept Malique's testimony regarding his purchase of the weapon and, in any event, ownership of the gun, while relevant, is not dispositive. The evidence as outlined above was sufficient, when viewed in the light most favorable to the prosecution, to support a finding that Howell constructively possessed—perhaps jointly with Malique—the gun with an obliterated serial number.

### 2. *The weight of marijuana alleged in Count III*

In finding that the evidence was sufficient to allow a jury to conclude beyond a reasonable doubt that Howell possessed at least 4,000 grams—or approximately 8.8 pounds—of marijuana, the Superior Court acknowledged that the quantity of marijuana seized at 12 Bradbury was insignificant. The court nevertheless concluded that the evidence "as a whole"[81] supported the jury's finding as to weight. Specifically, the court identified the following evidence as supporting the finding:

---

[80] *Howell*, 2020 WL 1492787, at *6.
[81] *Id.*

- The $2,400 in cash found at 12 Bradbury
- Detective Riccobon's testimony that marijuana sells for between $1,500-$3,000 a pound
- Caldwell's testimony that he regularly purchased two pounds of marijuana from Howell
- Caldwell's testimony that Howell had confided in him that he was selling marijuana to Abdula and "Nasty" in quantities ranging from 15 to 25 pounds.
- The seizure at 12 Bradbury of approximately 100 vacuum-sealer bags, an unidentified number of which contained marijuana residue and each of which could hold up to one pound of marijuana.
- The text messages supporting Caldwell's testimony "namely that Malique and Howell were conspiring to deal drugs and that Malique regularly was selling as little as a quarter pound of marijuana up to multiple pounds.[82]

If this were the only evidence supporting the jury's conclusion that Howell possessed 4,000 grams of marijuana during the indictment's date range, the trial court's denial of Howell's motion for judgment of acquittal would stand on shaky ground. The amount of cash found at 12 Bradbury was in the range of the price of one pound or 453.6 grams of marijuana, far below the 4,000 gram threshold. Caldwell's purchases were at approximately one-quarter of the weight to be proved, and his testimony about Abdula's and "Nasty's" purchases did not suggest that they occurred within the indictment's date range. And we find the notion that a quantity of empty bags sufficient to hold a certain quantity of marijuana is evidence that the bags once—and at the same time—held that quantity lacks persuasive force.

---

[82] *Id.*

45

Despite these reservations, our review of the entire record and, in particular, one piece of evidence not mentioned by the trial court, convinces us that, when the evidence is viewed in the light most favorable to the prosecution, a rational fact-finder could find beyond a reasonable doubt that Howell possessed 4,0000 or more grams of marijuana within the indictment's date range. Specifically, Brian Caldwell testified, in response to questions asked by Howell's counsel, that he had seen "well over a hundred pounds"[83] of marijuana at 12 Bradbury when he was at the residence in early February 2018. To be sure and as we previously noted, Caldwell's testimony on this point is beset by an apparent inconsistency.[84] But for present purposes we view this evidence in the light most favorable to the prosecution and, when we do that and consider it with the other evidence, Howell's argument that the weight evidence was insufficient collapses.[85] We therefore conclude that the trial court did not err when it denied Howell's motion for judgment of acquittal on this ground.

C. **The trial court did not abuse its discretion by admitting the Caldwell's testimony about his prior drug transactions with Howell and Howell's offer to sell him an illegal firearm**

As mentioned, on the first day of trial, Howell filed a "Motion for D.R.E. 404(b) Admissibility Hearing," asking the Superior Court "to conduct a *voir dire*

---

[83] App. to Answering Br. at B166.
[84] *See supra* note 40.
[85] *See Torres v. State*, 979 A.2d 1087, 1097 (Del. 2009) (Cocaine buyer's testimony that he received 500 grams of cocaine from defendant, when taken in the light most favorable to the State, was alone sufficient to establish that the cocaine weighed in excess of 100 grams).

Hearing to determine the admissibility of offered testimony sought to be introduced via the State's confidential informant . . . ."[86] The motion referred to a recording of some unidentified event "conducted by the Prosecutor . . . and the Chief Investigating Officer."[87] It alleged that "[t]he recording is replete with multiple references of other bad acts and/or criminal misconduct that represents uncharged offenses *vis-á-vis* the issues to be presented at trial."[88] Instead of identifying the prior uncharged misconduct and the stating the reasons for its inadmissibility, the motion contended that, "to determine the admissibility of such evidence, the Court is required to perform a *Getz/DeShields* analysis with regard to all items of evidence sought to be introduced through this witness."[89] At the same time, Howell filed a Motion *in Limine* to Prevent Unfairly Prejudicial Information Presented [*sic*] to the Jury," in which he identified five categories of "potentially inflammatory and unfairly unprejudicial information.[90] That the prosecution might seek to place before the jury:

> (1) that Howell was the victim of a home invasion that resulted in a theft of more than $200,000 in United States currency;
> (2) that Howell's neighbor was a suspect in the home invasion;
> (3) that Howell would deliver 20 pounds every week of marijuana to one individual and 15 to 25 pounds per week to another individual;

---

[86] D.I. 47 at 1.
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] D.I. 45.

(4) that Howell might have attempted to intimidate Caldwell during a chance meeting at an Ocean City, Maryland resort; and

(5) that Howell's mother's boyfriend belonged to a "motorcycle gang reported to be responsible for many acts of violence."[91]

As with his Rule 404(b) motion, this motion asked the court to conduct a *voir dire* hearing before Caldwell testified and to require the State to offer a[n] 'evidentiary preview' of the question and answers that will be presented to [Caldwell] during the course of the direct examination."[92] Presumably, this would permit Howell to interpose an objection if he thought that any of the questions were out of bounds.

When the court took up these motions after jury selection, the State identified two additional subjects not identified in Howell's motions that would likely be touched upon during Caldwell's testimony—that for at least a year before Howell's arrest, he was regularly selling marijuana to Caldwell for redistribution and that Howell had offered to sell Caldwell a firearm with an obliterated serial number. The court then asked Howell's counsel to speak in support of his motion. Counsel suggested that the court defer consideration of his motions until after hearing from the other witnesses but before Caldwell's testimony, and the court agreed.

Two days later, immediately before Caldwell took the stand, the court addressed Howell's motions. The prosecutor clarified that he intended to address

---

[91] *Id.* at 3.
[92] *Id.*

four topics with Caldwell that might implicate D.R.E. 404(b)'s restrictions on the admissibility of prior uncharged misconduct: (1) the home invasion: (2) Caldwell's knowledge of Howell's sales of large quantities of marijuana to two other individuals; (3) Howell's course of drug dealing; including regular sales of marijuana to Caldwell during the year preceding his arrest; and (4) Howell's offer to sell Caldwell a firearm with an obliterated serial number. As things turned out, the State did not ask Caldwell about the home invasion, and Howell withdrew his objection to Caldwell's testimony about Howell's large marijuana sales to others.[93] Thus, we need only concern ourselves with the Superior Court's decision to permit evidence of Howell's past sales of marijuana to Caldwell and his offer to sell Caldwell a gun with an obliterated serial number.

We review a trial court's admission of evidence under D.R.E. 404(b) for abuse of discretion.[94] D.R.E. 404(b) prohibits the prosecution from introducing evidence of uncharged misconduct to prove the defendant's character in order to show that, on the occasion giving rise to the charges before the court, the defendant acted in

---

[93] *See* App. to Answering Br. at B84:
    The Court: So to be clear, you're not objecting to the complaining witness testifying as to his personal knowledge that this defendant sold quantities of marijuana to individuals names Abdulla and Nasty?
    Counsel: That is correct. There is logic to that.
*See also id.* at B95:
    Counsel: . . . I did not object to the informant indicating that he was present when there was a sale of 20 pounds or whatever to Abdula and to Nick Nasty.
[94] *Campbell v. State*, 974 A.2d 156, 160 (Del. 2009).

accordance with that character. In other words, the State may not introduce evidence of the defendant's prior bad acts to show that the defendant has the propensity to commit—and, in fact, did commit—the act with which he stands charged. Such evidence, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, a lack of accident.

In *Getz v. State*, this Court fixed guidelines for the admissibility of evidence under D.R.E. 404(b)

> (1) The evidence of other crimes must be material to an issue or ultimate fact in dispute in the case. If the State elects to present such evidence in its case-in-chief it must demonstrate the existence, or reasonable anticipation, of such a material issue.
> (2) The evidence of other crimes must be introduced for a purpose sanctioned by Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition.
> (3) The other crimes must be proved by evidence which is "plain, clear and conclusive."
> (4) The other crimes must not be too remote in time from the charged offense.
> (5) The Court must balance the probative value of such evidence against its unfairly prejudicial effect, as required by D.R.E. 403.
> (6) Because such evidence is admitted for a limited purpose, the jury should be instructed concerning the purpose for its admission as required by D.R.E. 105.[95]

---

[95] *Getz v. State*, 538 A. 726, 734 (Del. 1988) (citation and footnote omitted).

A decade after *Getz*, in *DeShields v. State*,[96] this Court shed additional light on how a trial court should approach a Rule 404(b) analysis. Noting that D.R.E. 404(b) is identical to its counterpart in the Federal Rules of Evidence, the Court quoted one scholar's observation that

> [f]rom the language of the [Federal] Rule, as well as its legislative history, it is clear that the federal drafters created an open system in which a trial judge neither mechanically excludes, nor routinely accepts, other crimes evidence: rather, she . . . determines admissibility on the basis of such factors as probative value, potential prejudice, and the availability of alternative forms of evidence.[97]

That same scholar pointed to another treatise that set forth nine factors that a court should apply when conducting the Rule 403 balancing test under the fifth step of the *Getz* Analysis. Now frequently referred to as the "DeShields factors," they are:

> (1) the extent to which the point to be proved is disputed;
> (2) the adequacy of proof of the prior conduct;
> (3) the probative force of the evidence;
> (4) the proponent's need for the evidence;
> (5) the availability of less prejudicial proof;
> (6) the inflammatory or prejudicial effect of the evidence;
> (7) the similarity of the prior wrong to the charged offense;
> (8) the effectiveness of limiting instructions; and
> (9) the extent to which prior act evidence would prolong the proceedings.[98]

---

[96] *DeShields v. State*, 706 A.2d 502 (Del. 1998).
[97] *Id*. at 506 (quoting Graham C. Lilly, *An Introduction to the Law of Evidence*, §5.14, at 169 (3d ed. 1996)).
[98] *Id*. at 506–07 (quoting *Lilly*, *supra*; citing *C. Mueller & L. Kirkpatrick, Federal Evidence* §4.21 at 268–71 (1995)).

*1. Howell's past sales of marijuana to Caldwell*

Howell's challenge to the trial court's admission of evidence of Howell's marijuana sales to Caldwell during the year and a half preceding his arrest is, in a word, odd. First of all, Howell conceded that Caldwell's testimony that Howell was supplying other individuals—Abdula and Nasty—with large quantities of marijuana during the same time period was admissible under D.R.E. 404(b). What is more, Howell himself testified that he was selling marijuana by the pound in 2016 and did not get "out of the game"[99] until December 2017. Thus, it is difficult to see how the challenged evidence was unfairly prejudicial to Howell.

Be that as it may, we have reviewed the Superior Court's explanation of its reasons for admitting the evidence and find no abuse of discretion there. The court found that the testimony and the related text messages were material to show "a common[] plan or scheme, knowledge and intent."[100] We agree that, at a minimum, Howell's intent to deliver the marijuana seized on February 16 was, as an element of the crimes charged under Counts VIII and X of the indictment, material. The court next determined that the prior sales were not too remote, and we agree; the evidence showed a continuous course of conduct leading up to the charged offenses. In addition, the court's determination that the proof of the prior drug sales was plain,

---

[99] Trial Tr. at 238, Mar. 15, 2019.
[100] Trial Tr. at 82, Mar. 14, 2019.

clear, and conclusive is supported by the fact that it came in through the testimony of a witness—Caldwell—with firsthand personal knowledge. And Howell did not contest the propriety of the court's limiting jury instruction concerning the purpose for admitting this evidence as *Getz* requires.

Howell's biggest complaint seems to be that, because the trial court did not make an explicit reference to the *DeShields* factors, its balancing of the probative value and prejudicial effect of the 404(b) evidence was deficient. We disagree. Although the court's finding that "the highly probative nature of the course of conduct evidence was not outweighed by the danger of unfair prejudice,"[101] could be seen as conclusory, we are mindful that the court anchored its analysis in case law addressing similar facts.[102] And, as mentioned, Howell confirmed himself that he was a drug dealer during the time covered by Caldwell's testimony and the text messages. This evidence might have been cumulative—an objection Howell did not make—but, in light of Howell's admission, the danger of unfair prejudice was negligible.

---

[101] *Id*. at 83–84.

[102] *See Andreavich v. State*, 189 A. 3d 692, 2018 WL 3045599 (Del. June 19, 2018) (TABLE); *Torres v. State*, 979 A.2d 1087 (Del. 2009); *State v. Hynson*, 608 A.2d 730, 1992 WL 53419 (Del. Feb. 24, 1992) (TABLE).

53

### 2. *Howell's offer to sell Caldwell a "dirty" weapon*

The Superior Court considered and rejected Howell's challenge to the admissibility of Caldwell's testimony concerning Howell's offer—at an indeterminate time—to sell Caldwell a "dirty weapon,"[103] which Caldwell took to mean "[a] gun without a serial number."[104] According to the court, the testimony was "circumstantial evidence that the defendant constructively possessed the firearm with an obliterated serial number that was recovered from his home. It seems to be introduced for a purpose sanctioned by Rule 404(b) that is the defendant's knowledge and intent to possess that particular firearm."[105]

In his briefing in this Court, Howell makes only a passing reference to this ruling and has not presented any argument in opposition to it. We therefore find that Howell has abandoned this argument.

### D. **Any flaw in the trial court's obliterated serial-number instruction was harmless**

For the first time on appeal, Howell argues that the Superior Court's jury instruction relating to the possession-of-a weapon-with-an-obliterated serial-number charge was deficient. Because Howell did not object to the instruction in the

---

[103] App. to Answering Br. at B129.
[104] *Id*.
[105] Trial Tr. at 85, Mar. 14, 2019. Given that the evidence was introduced to show that Howell constructively possessed the firearm that is the subject of one of the charges for which he was on trial, D.R.E. 404(b) is not applicable. Put another way, evidence that tends to show that Howell possessed the very weapon for which he was charged is not "evidence of a crime, wrong or other act" within the meaning of Rule 404(b).

54

proceedings below, we review this claim under our plain-error standard as previously described.

To find Howell guilty, the jury was required to find that Howell knowingly possessed a firearm "*with the knowledge* that the importer's or manufacturer's serial number has been removed, obliterated or altered in a manner that has disguised or concealed the identity or origin of the firearm."[106]  Howell does not contest that Count V of the indictment, which was reproduced as part of the written jury instructions provided to the jury, adequately tracked this statutory language.  And so did the written jury instructions, which told the jury, in pertinent part, that

> [i]n order to find the Defendant guilty of Possession of a Weapon With a Removed, Obliterated or Altered Serial Number, you must find the State proved [the] following three elements beyond a reasonable doubt:
>     1.  The Defendant possessed a firearm;
>     2.  The serial number of the firearm had been removed or obliterated in a manner that disguised or concealed the identity or origin of the weapon; and
>     3.  The Defendant acted knowingly.
> "Knowingly" means the Defendant knew or was aware he possessed a firearm and knew or was aware the serial number of the firearm had been removed to hide the identity or origin of the firearm.[107]

Presumably, this written instruction was part of the instructions to which Howell assented when the court conferred with counsel about the instructions

---

[106] 11 *Del. C.* § 1459(a) (emphasis added).
[107] Jury Instructions, D.I. 55 at 27–28 (Mar. 18, 2019).

immediately before closing arguments.[108]  Yet when the court read the instructions following closing arguments, it omitted the definition of "knowingly" and merely reminded the jury that, "'[p]ossession,' 'firearm,' and 'knowingly' previously have been defined for you."[109]  All previous definitions of "knowingly," however, were related to the possessory elements of other offenses—that is, that the defendant knew or was aware that he possessed marijuana or a firearm; none would, in and of themselves, inform the jury that it was required to find that Howell knew of the serial number's obliteration or alteration.  And this, according to Howell, was "plainly erroneous."  We disagree.

For starters, other than to assert that the jury's acquittal of Howell under Count V's PFDCF charge was inconsistent with its guilty verdict on the obliterated-serial number charge and thus evidence of jury confusion, he does not explain how the seemingly incomplete—as distinguished from incorrect—instruction amounts to plain error.  Moreover, Howell's "inconsistent verdict" argument is incorrect.  As the Superior Court correctly noted when it denied Howell's motion for judgment of acquittal, the standard of proof of the possession element of the obliterated-serial number charge is different and more expansive than it is under the PFDCF statute.  Under the former, constructive possession can suffice, while under the latter,

---

[108] Trial Tr. at 2–12, Mar. 18, 2019.
[109] App. to Answering Br. at B256–256a.

availability and accessibility during the commission of the felony is required.[110]  For this reason, Howell's claim that the instruction was plainly erroneous because the jury's verdict was internally inconsistent fails.

The manner in which the Superior Court instructed the jury is not plain error for other reasons.  As the State correctly observes, jury instructions need not be perfect[111] and will pass muster if they are not misleading and allow the jury to "intelligently perform its duty in returning a verdict."[112]  Of course, jury instructions may not misstate the law.  But that is not what happened here.

Apparently, the court attempted to condense the instructions by eliminating redundant definitions.  Unfortunately, this well-intended endeavor caused the court to give an instruction that was less than ideal.  But we are satisfied that the instruction, when considered together with the instructions in their entirety, though arguably incomplete, did not jeopardize the fairness and integrity of Howell's trial.  In reaching this conclusion, we note that the trial court accurately set forth the elements of the obliterated-serial number charge, including the element of knowledge of the serial number's obliteration, when it reviewed the charges with the jury.  And the written jury instructions, which were given to the jury and available to it during deliberations, did not suffer from the same omission as did the

---

[110] *See Maddrey v. State*, 975 A.2d 772, 775 (Del. 2009).
[111] *Whalen v. State*, 492 A2d 552, 559 (Del. 1985).
[112] *Anderson v. State*, 2016 WL 618840, at *4 (Del. Feb. 15, 2016).

instructions as read in open court.[113]  We are therefore confident that the jury was able to apply the law to the facts as it found them.

### E. The trial court did not abuse its discretion when it declined to move Howell's trial to another courtroom

Immediately after the court denied Howell's continuance request and after the jurors had taken their seats in anticipation of opening statements, Howell's counsel raised a concern about the courtroom's configuration.  In particular, counsel claimed that, because of the placement of a large lectern, six of the twelve jurors would be unable to observe Howell as he sat at counsel table during the trial.  When the court asked what Howell's counsel would have the court do, he responded: "I would like to have a courtroom where [Howell] can be seen."[114]  Jurors, according to Howell's counsel, should have an unobstructed view of the defendant to gauge his reaction as other witnesses testify.  The court denied Howell's request that his trial be moved to another courtroom.

Although Howell did not couch his request below to move to another courtroom in constitutional terms, he now claims that the trial court's refusal "to afford [Howell] an unobstructed view of the jury [was] a violation of his

---

[113] The trial judge encouraged the jury to consult the written instructions should they have questions.  Trial Tr. at 122, Mar. 18, 2019, ("Ladies and gentlemen, I'm going to read to you the jury instructions that will apply to you during your deliberations.  The good news is you'll have copies of these jury instructions in the deliberation room with you.  So you don't need to memorize what I'm about to say, but please listen carefully.  It will give you a sense of the instructions overall, and then if you need [to] refer back to something, you will know where to look.")

[114] App. to Opening Br. at A48.

constitutional rights to due process and/or right of presence at trial."[115] This, of course, is not the claim that Howell made in the trial court; there, it was the jury's view of Howell that was his only concern. And that claim runs afoul of the principle that a defendant's courtroom demeanor, save when he is testifying, is not evidence and is therefore irrelevant.[116]

In addition to this flaw in Howell's argument, none of the cases he cites supports his contention that, because all jurors did not have an unobstructed view of him while seated at counsel table, he was not "present" for his trial. In all of them, the defendant was totally absent from all or a critical portion of his trial.[117] Here, Howell was physically present at every stage of his trial and was visible to all jurors when he testified. We therefore conclude that neither his right to be present at his trial or his due process rights were violated.

---

[115] Opening Br. at 13.

[116] *See Hughes v. State*, 437 A.2d 559, 572 (Del. 1981) ("[T]he courtroom demeanor of a defendant who has not testified is irrelevant. His demeanor has not been entered into evidence and, therefore, comment is beyond the scope of legitimate summary."); *see also Norwood v. State*, 991 A.2d 18, 2010 WL 703107, at *2–*3 (Del. Mar. 1, 2010) (TABLE) (finding no plain error where court did not rearrange courtroom to permit juror to view defendant in his seat.")

[117] *Crosby v. United States*, 506 U.S. 255 (1993) (defendant tried *in absentia*); *Bustamente v. Eyman*, 456 F. 2d 269 (9th Cir. 1972) (defendant, who had been taken from courthouse to county jail when case was submitted to jury, was not returned and therefore not present when court reconvened for rereading of jury instructions); *Bradshaw v. State* 806 A.2d 131 (Del. 2002) (defendant absent from courtroom for trial court's reading of *Allen* charge).

59

## III.    CONCLUSION

Because we have determined that the Superior Court's erroneous "cooperative witness" instruction was so clearly prejudicial to Howell's substantial rights as to jeopardize the fairness and integrity of his trial, we reverse his convictions and remand this matter for a new trial consistent with this opinion.